Filed 3/16/17 (unmodified opn. attached)

CERTIFIED FOR PUBLICATION


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT


| | |
|---|---|
| JANE DOE, a Minor, etc., | H040688 |
| | (Santa Clara County |
| Plaintiff and Appellant, | Super. Ct. No. CV238994) |
| v. | |
| UNITED STATES YOUTH SOCCER ASSOCIATION, INC. et al., | ORDER MODIFYING OPINION AND DENYING REHEARING |
| Defendant and Respondent. | [NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on February 22, 2017, be modified as follows:

1.      On page 11, the first full paragraph, beginning with the fourth sentence "While parents were present" through the end of that paragraph ending with "during these practices" delete and replace it with the following so it reads:


"There are allegations that some parents were present at some games, social events, and practices, but these allegations do not state whether parents were present for the entire game, social event, or practice.  Moreover, there are no allegations that all, or even a majority, of the parents were present at all soccer-related activities.  Thus, as in the school, day care, and scouting settings, defendants, through the coaches, acted as "quasi-parents" by assuming responsibility for the safety of the players whose parents were not present."

2.     On page 12, the second full paragraph, delete the last sentence beginning with "Similarly, here" and replace it with the following sentence so the sentence reads:

"Similarly, here, parents entrusted their children to defendants with the expectation that they would be kept physically safe and protected from sexual predators while they participated in soccer activities."

There is no change in the judgment.

The petition for rehearing is denied.

_____          _____
Date                             Mihara, J.


                                 _____
                                 Elia, Acting P. J.


                                 _____
                                 Grover, J.


*Doe v. United States Youth Soccer Association, Inc. et al.*
H040688

2

Trial Court:                                    Santa Clara County Superior Court

Trial Judge:                                    Honorable Kevin E. McKenney

Attorney for Plaintiff and Appellant:           Kelly Raftery
                                                Andrew Joseph Piunti
                                                DPA law Group


Attorneys for Defendant and Respondent
United States Youth Soccer Association, Inc.:    Margaret Manton Holm
                                                M. Christopher Hall
                                                Sedgwick LLP

                                                Rachel Elizabeth Hobbs
                                                Neil Howard Selman
                                                Selman Breitman LLP


Attorneys for Defendants and Respondents
California Youth Soccer Association, Inc.
and West Valley Youth Soccer League:            Oscar Amor Pardo
                                                David Fernando Beach
                                                Deborah Sandine Bull
                                                Perry, Johnson, Anderson, Miller &
                                                Moskowitz LLP

*Doe v. United States Youth Soccer Association, Inc. et al.*
H040688

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| JANE DOE, a Minor, etc.,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>UNITED STATES YOUTH SOCCER ASSOCIATION, INC., et al.,<br><br>    Defendant and Respondent. | H040688<br>(Santa Clara County<br>Super. Ct. No. CV238994) |

Plaintiff Jane Doe, a minor, was sexually abused by Emanuele Fabrizio, her former soccer coach. Plaintiff filed an action for negligence and willful misconduct against defendants United States Youth Soccer Association, Inc. (US Youth), California Youth Soccer Association, Inc. (Cal North), and West Valley Youth Soccer League (West Valley).[1] The trial court sustained these defendants' demurrers to the fourth amended complaint on the ground that they had no duty to protect plaintiff from criminal conduct by a third party and entered a judgment of dismissal as to these defendants. We hold that defendants had a duty to conduct criminal background checks of all adults who would have contact with children involved in their programs. Accordingly, the judgment is reversed.

---

[1] The complaint also included a cause of action for assault and battery against Fabrizio. He is not a party to this appeal.

# I.  Standard of Review

"On appeal from a judgment dismissing an action after sustaining a demurrer without leave to amend, the standard of review is well settled.  We give the complaint a reasonable interpretation, reading it as a whole and its parts in their context.  [Citation.] Further, we treat the demurrer as admitting all material facts properly pleaded, but do not assume the truth of contentions, deductions or conclusions of law.  [Citations.]  When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action.  [Citation.]"  (*City of Dinuba v. County of Tulare* (2007) 41 Cal.4th 859, 865 (*Dinuba*).)  "Where, as here, a demurrer is to an amended complaint, we may consider the factual allegations of prior complaints, which a plaintiff may not discard or avoid by making ' " 'contradictory averments, in a superseding, amended pleading.' " ' [Citation.]"  (*Berg & Berg Enterprises, LLC v. Boyle* (2009) 178 Cal.App.4th 1020, 1034 (*Berg*).)  When the trial court has sustained the demurrer without leave to amend, this court must determine "whether there is a reasonable possibility that the defect can be cured by amendment:  if it can be, the trial court has abused its discretion and we reverse.  [Citation.]"  (*Dinuba*, at p. 865.)

## II.  Fourth Amended Complaint[2]

### A.  The Parties

Fabrizio sexually abused plaintiff, who was then 12 years old, from May 2011 until March 2012.  After he pleaded no contest to continuous sexual abuse of a child and lewd and lascivious acts on a child under age 14, he was sentenced to 15 years in state prison.

US Youth is a national youth soccer association.  Cal North is US Youth's designated state association, its highest administrative body in northern California, and a member of its Region IV.  West Valley is an affiliated league of Cal North.  Under US Youth's bylaws, Cal North and West Valley are required to comply with US Youth's rules for the operation of US Youth soccer programs.  Fabrizio was employed by West Valley and was a member of US Youth.  Plaintiff participated in US Youth soccer programs and played for West Valley's soccer teams.

### B.  Negligence

The second cause of action alleged negligence against US Youth, Cal North, and West Valley.  Plaintiff alleged:  defendants had a duty to protect her from Fabrizio's criminal conduct; defendants breached their duties to her by failing to conduct criminal background checks and by failing to warn or educate her about the risk of sexual abuse; and defendants' breach of their duties proximately caused her injuries.

---

[2]     When the trial court strikes all or part of a pleading under Code of Civil Procedure section 435 et seq., this court reviews the order for abuse of discretion.  (*Quiroz v. Seventh Ave. Center* (2006) 140 Cal.App.4th 1256, 1282.)  However, a trial court's exercise of discretion that rests on an error of law is an abuse of discretion.  (*Catalina Yacht Club v. Superior Court* (2015) 242 Cal.App.4th 1116, 1124.)  Since we will conclude that the trial court erred in ruling that defendants had no duty to conduct criminal background checks, it abused its discretion in striking certain allegations on the ground that they were irrelevant.  Accordingly, our summary of the fourth amended complaint includes all relevant allegations.

3

## 1. The KidSafe Program

In 1994, US Youth acknowledged that pedophiles were drawn to its youth soccer program to gain access to children, and its program presented an unacceptable risk of harm to children unless appropriate preventative measures were taken. US Youth developed the KidSafe Program, which was designed to educate adult volunteers, coaches, employees, parents, and players participating in its soccer programs regarding the prevention and detection of sexual abuse. The KidSafe Program states that its ultimate objective is "'to exclude from participation in [US Soccer] activities all persons who have been convicted of felonies, crimes of violence or crimes against a person.'"

Sometime in the mid-1990's, US Youth distributed hundreds of copies of its KidSafe Program pamphlets to each state association, including Cal North. Thereafter, US Youth sent copies of these educational pamphlets on request. Many of these pamphlets, which could be accessed through links on defendants' Web sites, emphasized the importance of teaching parents and other adults about the warning signs of sexual abuse in youth sports and how to detect predators. The pamphlets also listed safety guidelines, which set forth appropriate conduct for adults and outlined "red flags" or warning signs of abuse. In addition, US Youth presented KidSafe Program materials at annual and regional meetings.

Neither US Youth nor Cal North required that West Valley coaches, volunteers, trainers, and administrators receive or be trained in the KidSafe Program. West Valley never conducted any meetings for parents to discuss the KidSafe Program. Neither West Valley nor Cal North e-mailed links to the KidSafe Program pamphlets to parents of children participating in US Youth programs.

## 2. Fabrizio's Conduct

In the spring of 2011, Fabrizio was an assistant coach of two West Valley teams, OA 97 and OA 98. Plaintiff played for a short time on the OA 98 team and was later moved to the OA 97 team. As a coach, Fabrizio violated several of the US Youth safety

4

guidelines: he held practices for which he was the only coach present in June 2011 and at the week-long soccer camp in August 2011; he made excessive and disproportionate physical contact with plaintiff; he drove plaintiff to and from practices and games alone; he helped her put away equipment after practices as the other players were leaving or had left and they could not be seen from the field; he singled out plaintiff for training sessions involving one or two players; he acted "impulsively, immaturely, and in an egocentric manner" by abruptly leaving the field during practices; and he used inappropriate and excessive physical discipline as well as foul and offensive language.

Fabrizio also spent extensive time alone with plaintiff on June 11 and 12, 2011. He drove her alone to and from a tournament in Santa Cruz, even though her parents attended 30 minutes of the final game. During the tournament, Fabrizio took plaintiff alone for two walks. After parents and girls speculated about whether there was romantic or sexual activity between plaintiff and Fabrizio, plaintiff became upset by the girls' comments and told the coaches and the team parent, T.B. M.R., a coach, asked plaintiff whether she and Fabrizio had engaged in a sexual act. The coaches later held two team meetings to discuss the comments and tried to get the girls to apologize to plaintiff.

Fabrizio engaged in grooming behavior of plaintiff and her family when he became friendly with them, visited them at their home, was helpful to them, and offered to drive plaintiff to games and practices and to pick her up from such events when her parents were unable to do so. Z.D., a coach, M.R., and parents knew that plaintiff's parents trusted Fabrizio and were friendly with him.

### 3. Reassignment and Eventual Termination of Coaching Privileges

After parents complained about Fabrizio's harsh discipline of the girls prior to September 2011, West Valley reassigned him to a boys' soccer team. Since the boys' team practiced at the same time as the girls' team, Fabrizio continued to select plaintiff and sometimes another girl to practice with the boys.

5

Z.D. discovered that Fabrizio was trying to take over the OA 97 girls' team and become the sole head coach. On November 12, 2011, Z.D. informed Scott Hughes, a member of the West Valley Board of Directors (Board) that there had been "rumors" about Fabrizio having "some bad intentions" toward some of the players on the team. Z.D. stated that he "had dealt with" these problems by instituting a "code of conduct" for Fabrizio, but some of Fabrizio's "traits" concerned him. Z.D. asked to speak with Hughes privately. Later that day, Z.D. notified Fabrizio that he was suspended from coaching duties at West Valley. He listed the reasons for the suspension: lack of respect for the players on the boys' team, using foul language with OA 97 players, and spending one-on-one time with players.

Two days later, West Valley notified parents of OA 97 and OA 98 players that Fabrizio had been suspended from coaching, but provided no reasons for the suspension. West Valley never interviewed plaintiff, other OA players, or their parents about Fabrizio. About a week later, Hughes informed Fabrizio that West Valley had conducted an investigation and learned that he had not followed several Cal North rules, including the physical contact and language rules. He also informed Fabrizio that his coaching privileges would not be reinstated.

Though it became more difficult for Fabrizio to have contact with plaintiff, he continued to do so. Since West Valley did not inform plaintiff's parents that Fabrizio had been suspended due to inappropriate touching of plaintiff and one-on-one contact with plaintiff, West Valley withheld information that would have put plaintiff's parents on notice that they needed to be "extra vigilant" in keeping Fabrizio away from plaintiff.

### 4. Criminal Background Checks

US Youth bylaws require that its state associations and each affiliate league collect and screen criminal conviction information on its coaches, trainers, volunteers, and administrators who will be in contact with US Youth child members, including those like

6

plaintiff. US Youth permitted its state associations and leagues to collect this information by means of a "voluntary disclosure" form.

Though US Youth did not require criminal background checks by independent third parties, it negotiated a discounted rate with an online vendor to permit state associations, leagues, or teams to obtain nationwide criminal background checks on an applicant for $2.50 per search. By 2010, nearly all of the state associations within Region IV used third party independent sources to run annual criminal background checks on their volunteers, coaches, and trainers. US Youth kept records regarding which state associations did and did not conduct these background checks and distributed monthly reports indicating which individuals had been disqualified from participation in US Youth soccer programs due to prior convictions.

In 2009, Thomas Anderson, the founder of West Valley and a member of the Cal North Hall of Fame was charged in Santa Clara County with multiple felony child molestation offenses arising from incidents with two 11-year-old boys. Anderson had been a coach, volunteer, and referee for local US Youth activities until at least 1998. West Valley was unaware of Anderson's prior misdemeanor convictions of child sexual abuse from the mid-1990's, because it did not conduct criminal background checks.

When Fabrizio applied for a coach position with West Valley in 2010, he was required to fill out a form which asked whether he had been convicted of a felony, a crime of violence, or a crime against a person. The disclosure form stated that US Youth might deny certification to any person who has been convicted of these types of offenses. Though Fabrizio had been convicted in 2007 of battery against his spouse, he answered no to each of these categories and authorized Cal North and West Valley to confirm this information. Neither Cal North nor West Valley conducted a criminal background check.

## C. Willful Misconduct

The third cause of action incorporated by reference the negligence allegations and alleged that they amounted to willful misconduct by US Youth and West Valley.

Though US Youth knew that voluntary disclosure by an applicant of his or her criminal convictions was ineffective, US Youth did not require its affiliates to conduct criminal background checks. The risk management committee of US Youth recommended that mandatory criminal background checks be required. A memorandum to US Youth stated: "From a risk management standpoint it certainly makes good sense to conduct criminal background checks of all volunteer and paid adults that have contact with US Youth Soccer players. But, from a negligence standpoint, regularly conducting criminal background checks of volunteers and paid adults creates a self-imposed duty to do the same for all that serve in a similar capacity. The failure to conduct such a check would be considered as a breach of duty, which, in turn could mean liability." West Valley also knew that a criminal background check would identify applicants who lied about their background on the self-disclosure form, but it failed to conduct criminal background checks.

West Valley also failed to take action when it learned of Fabrizio's inappropriate conduct towards plaintiff and failed to warn her parents. Though West Valley coaches knew that plaintiff was the target of Fabrizio's attention in June 2011, they continued to allow Fabrizio to have access to her. In fall 2011, the West Valley Board was informed that Fabrizio had "possible 'bad intentions'" toward plaintiff and had continued to have one-on-one contact with plaintiff after he had been warned not to do so. Nevertheless, the West Valley Board did not report its suspicions to Cal North, Region IV officials, law enforcement authorities, child protective services, or plaintiff's parents. Plaintiff's parents were not told that West Valley suspended Fabrizio because it feared that Fabrizio was going to or had sexually abused plaintiff. West Valley also chose not to interview plaintiff and her parents, because it did not want a scandal or lawsuit.

8

## III.  Discussion

### A.  Negligence

### 1.  General Principles

Plaintiff contends that defendants had a duty to protect her from criminal conduct by Fabrizio.

In order to succeed in an action for negligence, the plaintiff must establish that the defendant owed him or her a legal duty, the defendant breached that duty, and the breach proximately caused his or her injuries.  (*Kesner v. Superior Court* (2016) 1 Cal.5th 1132, 1142 (*Kesner*).)  The first element, duty, "may be imposed by law, be assumed by the defendant, or exist by virtue of a special relationship." (*Potter v. Firestone Tire & Rubber Co.* (1993) 6 Cal.4th 965, 985.)  " 'Duty is a question of law for the court, to be reviewed de novo on appeal.' " (*Kesner*, at p. 1142, quoting *Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 770.)

In general, "each person has a duty to use ordinary care and 'is liable for injuries caused by his failure to exercise reasonable care in the circumstances . . . .' " (*Parsons v. Crown Disposal Co.* (1997) 15 Cal.4th 456, 472 (*Parsons*), quoting *Rowland v. Christian* (1968) 69 Cal.2d 108, 112 (*Rowland*).)  Absent a statutory exception to this general rule, courts should find an exception to the duty of reasonable care only where "clearly supported by public policy.  [Citations.]" (*Rowland*, at p. 112.)

There is a "distinction between action and inaction, or misfeasance and nonfeasance.  Misfeasance exists when the defendant is responsible for making the plaintiff's position worse, i.e., defendant has created a risk.  Conversely, nonfeasance is found when the defendant has failed to aid plaintiff through beneficial intervention." (*Weirum v. RKO General Inc.* (1975) 15 Cal.3d 40, 49.)  "[A]bsent misfeasance, 'as a general matter, there is no duty to act to protect others from the conduct of third parties.' [Citation.]  [¶]  Even in the case of nonfeasance, there are 'recognized exceptions to the general no-duty-to-protect rule,' one of which is the special relationship doctrine.

9

[Citations.] 'A defendant may owe an affirmative duty to protect another from the conduct of third parties if he or she has a "special relationship" with the other person.' [Citation.]" (*Melton v. Boustred* (2010) 183 Cal.App.4th 521, 531-532.)

In cases involving nonfeasance and a special relationship between a plaintiff and a defendant, courts have balanced the policy factors set forth in *Rowland*, *supra*, 69 Cal.2d 108 to assist in their determination of the existence and scope of a defendant's duty in a particular case. (*Castaneda v. Olsher* (2007) 41 Cal.4th 1205, 1213.) These factors include: " ' "[T]he foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved." ' [Citations.] Foreseeability and the extent of the burden to the defendant are ordinarily the crucial considerations, but in a given case one or more of the other *Rowland* factors may be determinative of the duty analysis. [Citations.]" (*Ibid.*)

## 2. Special Relationship Doctrine

Here, plaintiff's negligence cause of action rested upon defendants' nonperformance of acts or nonfeasance, that is, defendants' failure to require or conduct criminal background checks and to warn or educate her about the risks of sexual abuse. Thus, defendants had no duty to plaintiff unless they stood in a special relationship to her.

A special relationship exists when "the plaintiff is particularly vulnerable and dependent upon the defendant who, correspondingly, has some control over the plaintiff's welfare. [Citation.]" (*Kockelman v. Segal* (1998) 61 Cal.App.4th 491, 499.) *Juarez v.Boy Scouts of America, Inc.* (2000) 81 Cal.App.4th 377 (*Juarez*) is instructive. In *Juarez*, the plaintiff, a boy scout, brought an action against the Boy Scouts of America, Inc. and the San Francisco Bay Area Council (collectively, the Scouts) for, among other

10

things, negligence for failing to take reasonable measures to protect him from sexual abuse by his scoutmaster. (*Id.* at pp. 384-385.) The court in *Juarez* considered the special relationship doctrine in determining the defendants' duty and observed: "Generally, a greater degree of care is owed to children because of their lack of capacity to appreciate risks and avoid danger. [Citation.] Consequently, California courts have frequently recognized special relationships between children and their adult caregivers that give rise to a duty to prevent harms caused by the intentional or criminal conduct of third parties. Recognized special relationships include an operator of a preschool or day care center to the children in attendance [citation]; a school district to a mother whose child was sexually molested by another student because the school stood in loco parentis while the child was in attendance [citation]; and the wife of a sexual offender to children she invited to play in her home because 'being of tender years they were particularly vulnerable to this sort of misconduct and not fully able to protect themselves against it. [Citation.]' [Citation.]" (*Id.* at p. 410.) Based on the vulnerability of children and the insidious methods of sexual offenders, the court in *Juarez* held that there was a special relationship between the Scouts and the plaintiff. (*Id.* at p. 411.)

West Valley and Cal North argue that *Juarez* is distinguishable from the present case, because, here, parents were present at practices, games, and team social events, and thus "they never acted as quasi-parents with respect to the players." They also note that, unlike in *Juarez*, there were no allegations that plaintiff participated in any overnight soccer activities. The record does not completely support their argument. While parents were present at games and social events and there is no mention of any overnight activities, the record establishes that parents were only present at practices when they dropped off the players or arrived to pick them up. Players typically spend far more time at practices than at games or soccer social events. As in the school, day care, and scouting settings, defendants, through the coaches, acted as "quasi-parents" by assuming responsibility for the safety of the players during these practices.

11

West Valley and Cal North point out that a school district has a special relationship with the district's students "arising from the mandatory character of school attendance and the comprehensive control over students exercised by school personnel." (*C.A. v. William S. Hart Union High School District* (2012) 53 Cal.4th 861, 869-870.) They then argue that since participation on the West Valley team was voluntary, there could be no special relationship.

This court rejected the same argument in a case involving a day care provider's duty to disclose suspected molestation:  "But mandatory attendance is merely one of multiple bases for the special relationship in a school context.  As *M.W. v. Panama Buena Vista Union School Dist.* (2003) 110 Cal.App.4th 508, 524-525 . . . makes clear, the special relationship between a school and its pupils is also based on 'the expectation and reliance of parents and students on schools for safe buildings and grounds, and the importance to society of the learning activity that takes place in schools.'  That expectation of safety is equally present when parents entrust their children to a day care provider like Camp, which stood in loco parentis while minor was at the camp. [Citation.]" (*Doe v. Superior Court* (2015) 237 Cal.App.4th 239, 247.)  Similarly, here, parents entrusted their children to defendants with the expectation that they would be kept physically safe and protected from sexual predators while they were at soccer practices.

Relying on *N.K. v. Corporation of Presiding Bishop of Church of Jesus of Latter-Day Saints* (Wash. App. 2013) 175 Wash.App. 517, 536 (*N.K.*), and *Doe v. Big Brothers Big Sisters of America* (Ill. App. 2005) 359 Ill.App.3d 684, 692, 702 (*Big Brothers*), US Youth contends that it lacked physical custody and control, and thus had no special relationship with plaintiff.

*N.K.* involved facts almost identical to those in *Juarez*, that is, a boy scout brought a negligence action against the Boy Scouts of America and the local boy scouting council for failing to protect him from sexual abuse by a scout leader.  (*N.K.*, *supra*, 175

12

Wash.App. at p. 522.)  The court in *N.K.* stated that it had been unable to find authority that "has allowed a case to proceed on the theory of a protective relationship in the absence of a custodial relationship between the organization and the victim" and held that there was no special relationship with the plaintiff.  (*N.K.*, at p. 535.)  In *Big Brothers*, *supra*, 359 Ill.App.3d 684, the minor plaintiff filed an action against, among others, a national youth mentoring organization for negligently failing to protect him from sexual abuse by a volunteer for one of the local affiliates.  (*Id.* at p. 692.)  The court in *Big Brothers* held that there was no special relationship, because the plaintiff was not in the custody of the national organization.  (*Id.* at p. 702.)

We disagree with *N.K.* and *Big Brothers* and find *Juarez* more persuasive.  Here, plaintiff was a member of US Youth and played on a West Valley team, which was the local affiliate of US Youth and Cal North.  West Valley was required to comply with the policies and rules of US Youth.  Since US Youth established the standards under which coaches were hired, US Youth determined which individuals, including Fabrizio, had custody and supervision of children involved in its programs.

In sum, we conclude that, as in *Juarez*, there was a special relationship between defendants and plaintiff.

### 3.  *Rowland* **Factors**

We next consider the *Rowland* factors.  We begin by examining whether it was foreseeable that a soccer coach would sexually abuse a player.  " '[A] duty to take affirmative action to control the wrongful acts of a third party will be imposed only where such conduct can be reasonably anticipated. [Citations.]' [Citation.]  Basically, 'the reasonableness standard is a test which determines if, in the opinion of a court, the degree of foreseeability is high enough to charge the defendant with the duty to act on it.' [Citation.]" (*Juarez*, *supra*, 81 Cal.App.4th at p. 402.)  Courts use a "sliding-scale balancing formula" under which "imposition of a high burden requires heightened foreseeability, but a minimal burden may be imposed upon a showing of a lesser degree

13

of foreseeability." (*Delgado v. Trax Bar & Grill* (2005) 36 Cal.4th 224, 243.) Heightened foreseeability can be shown by evidence of prior similar criminal incidents or "other indications of a reasonably foreseeable risk of violent criminal assaults . . . ." (*Id.* at p. 244.)

Relying on *Juarez*, *supra*, 81 Cal.App.4th 377 and *Doe 1 v. City of Murrieta* (2002) 102 Cal.App.4th 899 (*Doe I*), plaintiff argues that there was heightened foreseeability of sexual abuse by a coach based on defendants' knowledge of prior incidents and other indications of risk. Cal North and West Valley argue that plaintiff has shown only "a mere possibility of the risk of sexual abuse." US Youth argues that there was no foreseeability as a matter of law, because it did not have actual knowledge of Fabrizio's assaultive propensities.

*Juarez* involved facts regarding foreseeability that are similar to those in the present case. In that case, the Scouts had no information that the scoutmaster had previously molested a child or had a propensity to do so. (*Juarez*, *supra*, 81 Cal.App.4th at p. 386.) The court in *Juarez* pointed out that the Scouts had reported, "on average, more than one incident of sexual abuse per week for the past two decades, and with many more cases going unreported. [Citation.]" (*Id.* at p. 403.) The court in *Juarez* also noted that the Scouts had acknowledged in the "Boy Scout Handbook" that half of the incidents of child abuse were not reported. (*Ibid.*) Reasoning that its "analysis must focus on the *foreseeability* of harm occurring, not its probability, a more stringent standard," the court in *Juarez* concluded that it was reasonably foreseeable to the Scouts that a child participating in their program might be sexually molested by an adult volunteer. (*Id.* at pp. 403-404.)

In *Doe I*, two 16-year-old participants in the police department's "explorer" program brought an action against the City of Murrieta and the Murrieta Police Department for, among other things, negligence. (*Doe I*, *supra*, 102 Cal.App.4th at p. 904.) As part of the explorer program, police officers served as explorer advisors, who

took explorers on one-on-one ride-alongs. (*Id.* at p. 905.) As to foreseeability, the court in *Doe I* noted that the plaintiffs frequently went on one-on-one ride-alongs late at night with the explorer adviser, spent an unusual amount of time with him, called him frequently, and often waited for him for a ride home. (*Id.* at p. 914) The explorer advisor's superior was aware of this conduct and the plaintiffs' infatuation with him. (*Ibid.*) In addition, the court in *Doe I* referred to the Explorer Leader Handbook, which indicated an awareness of the potential for explorers to be sexually abused if certain procedures were not followed. (*Id.* at pp. 914-915.) The court in *Doe I* concluded that it was reasonably foreseeable that the explorer adviser would sexually abuse the plaintiffs. (*Ibid.*)

Here, defendants had no knowledge that Fabrizio had previously sexually or physically abused anyone or had a propensity to do so. But US Youth was "aware of incidents of physical and sexual abuse of US Youth Soccer's members by its coaches at a steady yearly rate of between 2 and 5 per year." More importantly, in recognition of the risks of sexual abuse to its players, US Youth had developed the KidSafe Program, which included a pamphlet that stated: "'One out of every 4 girls and one out of every 6 boys will be sexually abused before the age of 18. Fact: Pedophiles are drawn to places where there are children. All youth sports, including youth soccer, are such places.'" Though these statements did not establish the rate of sexual abuse in youth soccer programs, they were an acknowledgement by US Youth that children playing soccer were at risk for sexual abuse. As to Cal North and West Valley, there is no indication of the frequency of sexual abuse incidents affecting players in their leagues. However, Cal North and West Valley had adopted the KidSafe Program, which acknowledged that their soccer programs attracted those who might sexually abuse their players and that there had been incidents of sexual abuse. Moreover, the year before Fabrizio submitted his application, both Cal North and West Valley were aware of multiple sexual abuse incidents involving Anderson, the founder of West Valley. It is not clear whether these incidents occurred as

15

a result of his participation as a coach, volunteer, or referee for US Youth soccer activities, but these incidents demonstrated that pedophiles were drawn to activities involving children. Thus, while this record does not present evidence of heightened foreseeability, we conclude that it was reasonably foreseeable to defendants that a child participating in their soccer program would be sexually abused by a coach.

US Youth's reliance on *Chaney v. Superior Court* (1995) 39 Cal.App.4th 152 (*Chaney*), *Romero v. Superior Court* (2001) 89 Cal.App.4th 1068 (*Romero*), *Margaret W. v. Kelly R.* (2006) 139 Cal.App.4th 141 (*Margaret W.*), and *J.L. v. Children's Institute* (2009) 177 Cal.App.4th 388 (*J.L.*) does not persuade us otherwise.

In *Chaney*, *supra*, 39 Cal.App.4th 152, the defendant's husband sexually molested the plaintiff when she was a minor. (*Id.* at 155.) The plaintiff alleged that the defendant had negligently supervised her in the couple's home, because the defendant failed to recognize that her husband's "'excessive attention'" and "'excessive'" gift-giving indicated the possibility that he was sexually molesting the plaintiff. (*Id.* at p. 156.) The court in *Chaney* concluded: "Without knowledge of her husband's deviant propensities, a wife will not be able to foresee that he poses a danger and thus will not have a duty to take measures to prevent the assault. Although a wife's knowledge may be proven by circumstantial evidence, such inference must reflect the wife's actual knowledge and not merely constructive knowledge or notice." (*Ibid.*) Thus, the court in *Chaney* held that evidence presented by the plaintiff was insufficient to show that the defendant's husband's conduct was foreseeable. (*Id.* at p. 158.)

In *Romero*, *supra*, 89 Cal.App.4th 1068, the minor plaintiff and several other teenagers visited the defendants' home. (*Id.* at pp. 1073-1074.) The defendants were not aware that one of the teenagers had a history of misconduct at school, including fighting and sexual harassment of female students. (*Id.* at p. 1074.) When the defendants left their home for about an hour, he sexually assaulted the plaintiff. (*Id.* at p. 1075.) The plaintiff alleged that the defendants had failed to protect her against assaults by other

16

invitees. (*Id.* at p. 1077.) The court in *Romero* concluded that "the question of whether the defendant owed a duty of reasonable care to the injured minor depends on whether the assailant minor's conduct was *reasonably foreseeable*, but that conduct will be deemed to have been reasonably foreseeable only if the defendant had *actual knowledge* of the assaultive propensities of the teenage assailant." (*Id.* at p. 1081.)

In *Margaret W.*, *supra*, 139 Cal.App.4th 141, the defendant allowed her teenage daughter to invite her friends, including the plaintiff, to sleep at their house while she was gone for the evening. (*Id.* at p. 145.) Her daughter and one of her friends agreed that they would not drink any alcohol, have a party, or leave the house. (*Id.* at p. 146.) After the defendant left, they began drinking and other teenagers, including boys, arrived. (*Ibid.*) The plaintiff became intoxicated and left with the boys. (*Id.* at p. 147.) When one of the girls called the defendant and told her that her daughter had passed out, the defendant returned home to discover that the plaintiff and another girl had left " 'to party with a bunch of people.' " (*Ibid.*) No one told the defendant that the plaintiff and another girl were alone with three boys or at a boy's house. (*Ibid.*) At some point, the plaintiff called and asked if she could return to the defendant's home, but did not indicate that she was concerned for her safety. (*Id.* at pp. 147-148.) The defendant, who was upset that the girls had not complied with her rules and was busy caring for her daughter, told them that they should go home. (*Id.* at p. 148.) During the night, the plaintiff was sexually assaulted by the boys. (*Ibid.*) The court in *Margaret W.* reasoned that "foreseeability must be measured by what the defendant actually knew. None of these cases has held that a defendant owed a duty to take steps to prevent or respond to third party crime on the basis of constructive knowledge or information the defendant should have known." (*Id.* at p. 156.)

In *J.L.*, *supra*, 177 Cal.App.4th 388, the defendant Children's Institute, Inc. (CII), a nonprofit corporation, provided licensed childcare services. (*Id.* at p. 391.) CII also entered into contracts with day care providers and referred eligible families to these

family day care homes. (*Ibid.*) These contracts stated, in part, that a child care provider was not to be considered either an agent or an employee of CII. (*Id.* at p. 392.) The minor plaintiff was in the care of one of the family day care homes. (*Id.* at p. 393.) After the plaintiff's mother saw a teenager playing outside the home, the day care provider told her that her grandson was visiting. (*Ibid.*) There was no evidence of either inappropriate behavior by him or a history of sexual abuse, but the teenager ultimately sexually assaulted the plaintiff at the home. (*Ibid.*) The court in *J.L.* held that the teenager's conduct was not foreseeable and the defendant owed no duty to protect against the assault, because there was no evidence that the defendant had "actual knowledge" of the teenager's "assaultive tendencies or that he posed any risk of harm." (*Id.* at p. 398.)

*Chaney*, *Romero*, *Margaret W.*, and *J.L.* involved criminal conduct by family members or guests that occurred in homes, and there was no evidence to indicate that criminal conduct by these individuals was in any way foreseeable. The present case, like *Juarez*, involved criminal conduct by a member of an organization that provided activities exclusively for children. More importantly, here, defendants were aware that sexual predators were drawn to their organization in order to exploit children and that there had been prior incidents of sexual abuse of children in their programs. *J.L.* is further distinguishable from the facts before us, because Fabrizio was an employee of West Valley and a member of US Youth and these organizations controlled which individuals had access to the children in their programs. In contrast to *Chaney*, *Romero*, *Margaret W.*, and *J.L.*, these factors indicate a reasonably foreseeable risk of sexual abuse to children participating in defendants' programs.

We next consider the burden to defendants of requiring and implementing criminal background checks.

US Youth argues that it would impose a tremendous burden to mandate criminal background checks for employees and volunteers in defendants' programs, because the availability of criminal background checks varies among the states. Citing Gibbons and

18

Campbell, *Liability of Recreation and Competitive Sport Organizations for Sexual Assaults on Children by Administrators, Coaches and Volunteers*, 13 J. Legal Aspects Sport 185 (Fall 2003) pp. 192-193, US Youth also argues that volunteers working with children in the majority of states are not required to undergo criminal background checks and private entities are not allowed to obtain national criminal background checks on volunteers in many states.

We first note that the American Youth Soccer Organization, another national youth soccer organization, has required criminal background checks for its volunteers and coaches in these jurisdictions. Moreover, US Youth has required criminal background checks for all coaches and referees participating in its youth Olympic Development Program in the state associations since 2008. US Youth kept records of which state associations did and did not obtain these criminal background checks, and distributed reports of individuals who had been disqualified from participation in its youth programs. Since US Youth had demonstrated the administrative ability to ensure compliance with mandatory criminal background checks, the burden would not have been significant. As to Cal North and West Valley, nearly all of the state associations in Region IV had been conducting criminal background checks on all volunteers, coaches, and trainers since 2010, thus showing that it would not have been overly burdensome to Cal North and West Valley.

US Youth argues that the cost of mandating criminal background checks would be substantial. US Youth relies on plaintiff's third amended complaint, which states that US Youth registers "over 900,000 administrators, coaches and volunteers" annually and argues that "if criminal background checks cost $2.50 per check, this would amount to $2.25 million." If members of a team or the applicant had paid for the criminal

background check, defendants would not have born the cost.[3]  More importantly, there was and continues to be no cost for criminal background checks in California pursuant to Penal Code section 11105.3.  This statute provides that no fee shall be charged to nonprofit organizations for criminal background checks.[4]

Our consideration of the remaining *Rowland* factors supports a determination that defendants had a duty to conduct criminal background checks of adults who would have contact with children in their soccer programs.  The parties agree that plaintiff was injured by Fabrizio's conduct.  The connection between plaintiff's harm and defendants' failure to conduct a criminal background check was close.  If defendants had conducted a criminal background check of Fabrizio, his prior conviction for domestic violence would have been discovered and it would have been highly unlikely that he would have been

---

[3]     Assuming a soccer team has at least 11 players, a player's cost per search would amount to no more than $0.23.

[4]     US Youth counters that this statute did not apply to "community youth athletic programs" until August 2013.  US Youth is mistaken.  Former Penal Code section 11105.3 stated:  "(a) . . . an employer may request from the Department of Justice records of all convictions . . . of a person who applies for a license, employment, or volunteer position, in which he or she would have supervisory or disciplinary power over a minor or any person under his or her care. . . .  [¶]  (b) . . . no fee shall be charged to a nonprofit organization."  In 2013, the Legislature amended Penal Code section 11105.3 to include the following:  "(i)  As used in this subdivision, 'community youth athletic program' means an employer having as its primary purpose the promotion or provision of athletic activities for youth under 18 years of age.  [¶]  (j)  A community youth athletic program, as defined in subdivision (i), may request state and federal criminal history information pursuant to subdivision (a) for a volunteer coach or hired coach candidate.  The director of the community youth athletic program shall be the custodian of records."  (Pen. Code, § 11105.3, subds. (i), (j).)  Legislative history states that this amendment "*clarifies* that a community youth athletic program may request state and federal background checks, as well as subsequent arrest notification, for a volunteer coach or hired coach candidate."  (Assem. Com. on Appropriations, Assembly Bill No. 465 (2013-2014 Reg. Sess.) Apr. 29, 2013, italics added.)  It was also noted that "the background checks authorized in this bill can already be done under current law."  (*Ibid.*)  Thus, since it is undisputed that defendants were nonprofit organizations, there would have been no cost to conduct criminal background checks.

hired.  Thus, he would have had far fewer, if any, opportunities to sexually abuse plaintiff.  As to the policy of preventing future harm, our society recognizes that the protection of children from sexual abuse is a paramount goal.  (*Randi W. v. Muroc Joint Unified School Dist.* (1997) 14 Cal.4th 1066, 1078-1079.)  Imposition of a duty to conduct criminal background checks on defendants would assist in the achievement of this goal.

But the factor of moral blame weighs in favor of defendants.  There is nothing in the present record indicating that defendants were in any way involved in the sexual assault of plaintiff or knew that Fabrizio would harm her.  Nor did defendants act in bad faith or with reckless indifference to the consequences of failing to conduct criminal background checks.  Defendants made an attempt to identify potential sexual predators by requiring that an applicant disclose his or her prior criminal convictions and authorize that the information be verified.  Though this procedure proved ineffective in the present case, it was not unreasonable to expect that an applicant, who had a prior conviction, would abandon his or her application.  Accordingly, we do not attribute moral blame to defendants.

Regarding the consequences to the community and the availability and cost of insurance, US Youth argues that the imposition of a duty of care "could lead to potentially ruinous liability" and force the termination of US Youth and similar organizations.[5]  US Youth points out that many insurers have begun including sexual misconduct exclusions in their policies and others have imposed various limitations on coverage.  (Collins and Smethurst, McDermott Will & Emery, *Insurance Coverage*

---

[5]    Defendants also contend that mandating criminal background checks would deter volunteers from applying for positions with them.  We fail to understand how conducting a criminal background check would deter volunteers, since defendants already require an applicant to disclose any prior convictions and to authorize defendants to confirm the applicant's information.

21

*Issues Raised by Child Sexual Abuse Claims* (December 6, 2011); Haller, *Is There Coverage? Sexual Abuse Claims Against Nonparticipants*, For the Defense (May 2013) p. 71.) US Youth also claims that coverage, when available, is expensive. (Herman, *Abuse Coverage Isn't as Elusive as a Needle in a Haystack, but It Will Cost You.* https://www.nonprofitrisk.org/library/articles/insurance03112003.) In response, plaintiff has cited to an article at a recent American Bar Association seminar, which outlines the types of insurance available for sexual misconduct. (Insurance Coverage for Sexual Misconduct Claims, www.americanbar.org/content/dam/aba/administrative/litigation/materials/.) Since the availability and cost of insurance for defendants is uncertain, we decline to find these factors in favor of either plaintiff or defendants.

Here, balancing the degree of foreseeability of harm to children in defendants' soccer programs against their minimal burden, we conclude that defendants had a duty to require and conduct criminal background checks of defendants' employees and volunteers who had contact with children in their programs. Though we do not attribute moral blame to defendants, the other *Rowland* factors support our conclusion: plaintiff suffered injury, the connection between her injury and defendants' failure to conduct a criminal background check was close, and preventing harm to children is a paramount goal of our society. Since we have found that defendants had a duty to plaintiff, the fourth amended complaint states sufficient facts to constitute a cause of action for negligence.[6]

Yet we reach a different conclusion with respect to plaintiff's claim that defendants had a duty to protect her from Fabrizio's conduct by "warn[ing], train[ing], or

---

[6] Having concluded that the fourth amended complaint states a negligence cause of action against defendants, we need not consider whether West Valley negligently hired or retained Fabrizio.

22

educat[ing] her (either directly or through her parent or adult employees or team volunteers) about the risk of sex abuse in their programs from their coaches and of its guidelines to protect her and best practices for youth to avoid abuse."

Plaintiff does not discuss the training or educating that defendants should have done. Instead, she argues that a "warning could have been as simple as handing out an existing KidSafe Brochure, or going over KidSafe guidelines at the pre-season parent meeting," and thus the burden would have been minimal. We disagree. The subject of sexual abuse of children is a complicated one, and plaintiff's attempt to minimize the burden on defendants is not persuasive. Defendants are sports organizations. Children participate in these organizations to develop their athletic skills and to learn sportsmanship. These organizations are not designed to educate children, their parents, and others regarding the risk of sexual abuse. As US Youth points out, "there are no uniform standards for educating parents and children about the dangers of child predation in youth sports organizations. As such, it would be a daunting task to know at what age children should first be educated about sexual molestation, and to what extent." Moreover, many parents would consider the education of their children about the risk of sexual abuse to be their responsibility, not that of a youth sports organization. Plaintiff does not address these concerns. In our view, the burden imposed on defendants of implementing a sexual abuse education program for millions of players, their parents, adult employees, and team volunteers would be substantial.

The present case is also distinguishable from *Juarez*, *supra*, 81 Cal.App.4th 377 on this issue. In *Juarez*, the defendants had already developed a comprehensive program, including written materials and videotapes, to educate adult volunteers, parents, and boy scouts. (*Juarez*, at p. 398.) All paid employees were required to participate in a training program which set forth guidelines and training for volunteers, staff, and parents regarding protection against sexual molestation. (*Ibid.*) The Boy Scout Handbook, which was distributed to every boy scout, also included a 24-page pamphlet for parents

23

on how to protect children from child and drug abuse.  (*Id.* at p. 399.)  A Spanish language version of the handbook was available, but the plaintiff and his mother, who spoke only Spanish, were given the English language version.  (*Ibid.*)  The scoutmaster was also primarily Spanish-speaking and had never received any information regarding abuse prevention in Spanish.  (*Id.* at p. 400.)  Since there was already information available in the Spanish language, *Juarez* concluded that "people and systems are already in place to see that vital information needed to combat child sexual abuse is communicated at every level of scouting."  (*Id.* at p. 408.)

The facts in the present case are different from those in *Juarez.*  First, "millions of American parents partner with the Scouts collectively for the development of their children's core values."  (*Juarez*, *supra*, 81 Cal.App.4th at p. 408.)  No such relationship exists between parents of soccer players and defendants.  Second, boy scouts are required to engage in a range of activities that are "'designed to teach the moral principles to which the organization subscribes.' [Citation.]"  (*Id.* at p. 408.)  Defendants' activities for soccer players are not similarly designed.  Third, the program developed and implemented by the Scouts was far more extensive than the KidSafe Program.  Accordingly, *Juarez* does not persuade us that the burden on defendants would be slight.

Here, the creation and implementation of a sexual abuse education program to protect children in defendants' programs would be extraordinarily burdensome.  Balancing this burden against the level of foreseeability of sexual abuse in the present case, we decline to impose a duty on defendants to protect children by these means.  Nor does consideration of the remaining *Rowland* factors persuade us otherwise.[7]

---

[7]      Plaintiff also invokes the negligent undertaking doctrine.  Under this doctrine, "a volunteer who, having no initial duty to do so, undertakes to provide protective services to another, will be found to have a duty to exercise due care in the performance of that undertaking if one of two conditions is met:  either (a) the volunteer's failure to exercise such care increases the risk of harm to the other person, or (b) the other person reasonably relies upon the volunteer's undertaking and suffers injury as a result."

(*Continued*)

## B. Willful Misconduct

Plaintiff also contends that US Youth and West Valley engaged in willful misconduct.

Willful misconduct is not a separate tort from negligence, but rather " " " "an aggravated form of negligence, differing in quality rather than degree from ordinary lack of care' [citation]." ' " (*Berkley v. Dowds* (2007) 152 Cal.App.4th 518, 526.) In order to establish willful misconduct, a plaintiff must prove not only the elements of a negligence cause of action, that is, duty, breach of duty, causation, and damage, but also " " "(1) actual or constructive knowledge of the peril to be apprehended, (2) actual or constructive knowledge that injury is probable, as opposed to a possible, result of the danger, and (3) conscious failure to act to avoid the peril. [Citations.]"' [Citation.]" (*Id.* at p. 528.) " '[W]illful misconduct is not marked by a mere absence of care. Rather, it " " "involves a more positive intent actually to harm another or to do an act with a positive, active and absolute disregard of its consequences." ' " ' [Citations.]" (*Manuel v. Pacific Gas & Electric Co.* (2009) 173 Cal.App.4th 927, 940, quoting *Calvillo-Silva v. Home Grocery*

---

(*Delgado, supra*, 36 Cal.4th at p. 249.) " '[I]n order for liability to be imposed upon the actor [under the negligent undertaking doctrine], he must *specifically* have undertaken to perform the task that he is charged with having performed negligently, for without the actual assumption of the undertaking there can be no correlative duty to perform that undertaking carefully.' [Citation.]" (*Artiglio v. Corning, Inc.* (1998) 18 Cal.4th 604, 614-615, italics added.)

Here, US Youth provided the KidSafe Program educational pamphlets to each state association and presented KidSafe Program materials at annual and regional meetings. It also posted a link on its Web site to the KidSafe Program materials. However, US Youth did not require that Cal North forward KidSafe Program materials to West Valley or require that Cal North and West Valley employees or volunteers be trained in the KidSafe Program. Though Cal North adopted the KidSafe Program, it did not train or educate West Valley about the program. By merely providing information about sexual abuse in the KidSafe Program and presenting seminars on this issue, US Youth and Cal North did not increase the risk of harm to plaintiff. Plaintiff also did not rely on their undertaking. Accordingly, we reject plaintiff's argument.

25

(1998) 19 Cal.4th 714, 729 overruled on other grounds in *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853, fn. 19.)

Plaintiff argues that US Youth engaged in willful misconduct when it chose not to require criminal background checks for the harm it knew was occurring. She claims US Youth was more concerned about its potential liability if it imposed this requirement on all state associations. Though US Youth knew that children participating in its programs were at risk of sexual abuse, they did not have actual or constructive knowledge that injury to children like plaintiff was probable. More importantly, since US Youth took some steps to avoid harm to plaintiff and others by requiring a voluntary disclosure form, their conduct did not involve a positive intent to harm children in their soccer programs or act with complete disregard of the consequences. Thus, plaintiff's allegations against US Youth failed to support a cause of action for willful misconduct for their failure to require criminal background checks.

Plaintiff next argues that West Valley failed to take action when it learned of Fabrizio's inappropriate conduct. She asserts that West Valley knew facts no later than June 2011 that indicated that she was at risk of harm from Fabrizio and did not warn her parents of its concerns. Plaintiff points out that Fabrizio singled her out for rides alone in his car. Plaintiff ignores that her parents made the decision to allow him to drive her alone to games, practices, and tournaments. While Fabrizio and plaintiff almost always put away equipment in the shed, this conduct did not indicate that Fabrizio was sexually abusing her. Moreover, we fail to see how photographs of Fabrizio holding his arm around plaintiff at a team social event and at a San Francisco tournament, particularly when others were present in the photographs, would have indicated possible sexual abuse.

Plaintiff refers to an incident at the Santa Cruz tournament in which Fabrizio "sat next to plaintiff in the sand at the Santa Cruz [tournament], and, while burying each other with sand, touched her and allowed her to touch him." This allegation is contradicted in

26

her third amended complaint, which she may not now avoid. (*Berg*, *supra*, 178 Cal.App.4th at p. 1035.) Her third amended complaint alleged: "At a break during the tournament, Fabrizio sat in the beach sand surrounded by several 'OA' girls, including plaintiff. [¶] Fabrizio was laughing with the girls while the girls were near him, some in soccer shorts and others in bathing suits. Some girls, including plaintiff, were putting sand on his body and smoothing sand over him. Other 'OA' officials besides Fabrizio were present and saw this activity occurring." No reasonable person would view a group of children burying their coach in the sand at a beach as indicating that the coach had a sexual interest in any of the children.

Plaintiff also notes that Fabrizio took two walks at the Santa Cruz tournament with her, which caused some parents and other girls to gossip about romantic or sexual activity between Fabrizio and her. The third amended complaint contradicted the inference that there was sexual or romantic activity between them based on this conduct. (*Berg*, *supra*, 178 Cal.App.4th at p. 1035.) It alleged that when plaintiff was questioned by M.R., she denied any sexual conduct with Fabrizio and began crying. T.B. asked her why she was crying and she stated that some girls were being mean to her. Given that the other coaches and parents were aware that Fabrizio was a family friend, plaintiff's denial was plausible. Thus, the coaches believed her and tried to get the other girls to apologize.

In sum, West Valley's failure to warn plaintiff's parents in June 2011 did not constitute willful misconduct, because none of Fabrizio's conduct provided West Valley with actual or constructive knowledge that Fabrizio's sexual abuse of plaintiff was probable.

Plaintiff argues that since Fabrizio committed these acts with "an abnormal or unnatural sexual interest" in her, he violated Penal Code sections 288, subdivision (a) and

27

647.6, and thus Z.D. and M.R. witnessed acts of sexual abuse.[8]  Given that plaintiff eventually revealed sexual abuse by Fabrizio, Fabrizio's conduct in June 2011 can now be viewed in an entirely different light.  However, his conduct did not indicate to a reasonable person at that time that plaintiff was at risk of sexual abuse.

Plaintiff next argues that the West Valley Board "must have known, and did know, at the latest by the time it fired Fabrizio that [she] had suffered sexual abuse."

Z.D. informed Hughes that there had been "'rumors'" about Fabrizio having "'some bad intentions'" toward plaintiff and another player and he was concerned about some of Fabrizio's "'traits.'"  As previously noted, plaintiff denied the rumors of any impropriety by Fabrizio and complained that the other girls were being mean to her with their comments.  Plaintiff's allegations also do not specify the nature of Fabrizio's "'bad intentions'" and "'traits,'" and thus, one cannot reasonably infer that Z.D. told Hughes that he was concerned that plaintiff had suffered sexual abuse.  Z.D. also informed Hughes that Fabrizio had continued to have one-on-one contact with plaintiff after he had been warned not to do so.  This allegation does not support plaintiff's position that West Valley had actual or constructive knowledge that she was being sexually abused, since her parents were friendly with Fabrizio and allowed her to spend this time alone with him.

---

[8]      A violation of Penal Code section 288, subdivision (a) is committed by "any person who willfully and lewdly commits any lewd or lascivious act, . . . upon or with the body, or any part or member thereof, of a child who is under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passion, or sexual desires of that person or the child . . . ."  "A violation of section [Penal Code] section 647.6 requires proof of the following elements:  [¶]  1.  The defendant engaged in conduct directed at a child;  [¶]  2.  A normal person, without hesitation, would have been disturbed, irritated, offended, or injured by the defendant's conduct;  [¶]  3.  The defendant's conduct was motivated by an unnatural or abnormal sexual interest in the child or children generally; and  [¶]  4.  The child was under age 18 at the time of the conduct."  (*People v. Valenti* (2016) 243 Cal.App.4th 1140, 1161.)

28

Plaintiff contends that West Valley "fired Fabrizio, in part, as alleged, because of Fabrizio's conduct at the Santa Cruz tournament." But when West Valley fired Fabrizio for failing to follow Cal North rules governing physical contact and offensive language, no particular incidents were specified.[9] These rules were attached to the email. As West Valley points out, the rules on physical contact "broadly concern the potential for an appearance of impropriety as well as avoidance of actual impropriety, and the need for participants to avoid one-on-one physical contact in order to protect themselves from allegations made 'as a tool of revenge.'" There were repeated incidents in which Fabrizio violated this rule with plaintiff. However, given Fabrizio's relationship with plaintiff's parents and their consent in allowing Fabrizio to spend time alone with plaintiff, his violation of this rule is simply not enough to establish that the West Valley knew or should have known that Fabrizio was probably sexually abusing plaintiff and that West Valley consciously, or even negligently, failed to take action to prevent harm to her.

Plaintiff contends that any defects in the complaint can be cured by amendment. "'Leave to amend is properly denied if the facts and nature of plaintiff's claim are clear and under the substantive law, no liability exists [citation] or where it is probable from the nature of the defects and previous unsuccessful attempts to plead that the plaintiffs cannot state a cause of action [citation].' [Citation.]" (*Titus v. Canyon Lake Property Owners Assn.* (2004) 118 Cal.App.4th 906, 917.)

Here, plaintiff states that she can allege the following facts. Z.D. and M.R. told the West Valley Board that they observed Fabrizio with "his arm around [plaintiff's] hip,

---

[9]    Hughes's e-mail also stated:  "Currently, [the Board] is only taking action within the league, and has not informed anyone else of the infractions.  However, we will keep a record of all communications gathered, should [the Board] feel it is necessary to escalate the situation."  It is not clear whether plaintiff has included all of the information acquired during the Board's investigation.

29

holding her closely—as though she were his girlfriend—not in passing or in jest but for a protracted period of time" in May 2011.  M.R. told the West Valley Board about Fabrizio's "similar close holding" of plaintiff in late June 2011.  The West Valley Board was also informed that Fabrizio and plaintiff were "flirtatiously playing in the sand," took two walks at the Santa Cruz tournament, and M.R. asked plaintiff whether she had engaged in oral sex with Fabrizio.  The West Valley Board learned from Z.D. that when Z.D. reprimanded Fabrizio after the second walk in Santa Cruz, Fabrizio responded by yelling at Z.D., crying, and running off.  Plaintiff then chased after Fabrizio and asked him to return, but he did not.  He only returned after the final game to drive plaintiff home.  These allegations make clear that the West Valley Board was informed regarding Fabrizio's conduct in May and June 2011.  But the only newly alleged facts refer to Z.D.'s reprimand of Fabrizio and Fabrizio's response, and these facts do not include the substance of their conversation.  In our view, such facts do not establish that West Valley knew or should have known that Fabrizio had either sexually abused or would probably sexually abuse plaintiff.  Thus, even if plaintiff were granted leave to amend, she has failed to state a cause of action for willful misconduct against West Valley.

## IV.  Disposition

The judgment is reversed.  On remand, the trial court is directed to vacate its

order sustaining the demurrers without leave to amend.  The trial court is further directed to enter a new order sustaining the demurrers without leave to amend as to the cause of action for willful misconduct and overruling the demurrers as to the cause of action for negligence.  The parties are to bear their own costs.


_____

Mihara, J.


WE CONCUR:


_____

Elia, Acting P. J.


_____

Grover, J.

| | |
|---|---|
| Trial Court: | Santa Clara County Superior Court |
| Trial Judge: | Honorable Kevin E. McKenney |
| Attorney for Plaintiff and Appellant: | Kelly Raftery<br>Andrew Joseph Piunti<br>DPA law Group |
| Attorneys for Defendant and Respondent<br>United States Youth Soccer Association, Inc.: | Margaret Manton Holm<br>M. Christopher Hall<br>Sedgwick LLP<br><br>Rachel Elizabeth Hobbs<br>Neil Howard Selman<br>Selman Breitman LLP |
| Attorneys for Defendants and Respondents<br>California Youth Soccer Association, Inc.<br>and West Valley Youth Soccer League: | Oscar Amor Pardo<br>David Fernando Beach<br>Deborah Sandine Bull<br>Perry, Johnson, Anderson, Miller &<br>Moskowitz LLP |

*Doe v. United States Youth Soccer Association, Inc. et al.*
H040688