Filed 10/20/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| JOHN HG DOE, | B305810 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC679844) |
| v. | |
| THE ROMAN CATHOLIC ARCHBISHOP OF LOS ANGELES, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Olivia Rosales, Judge. Reversed with directions.

Law Offices of Anthony DeMarco, Anthony M. DeMarco and Alexandria L. Heins, for Plaintiff and Appellant.

McKool Smith Hennigan, J. Michael Hennigan, Lee W. Potts, and Elizabeth S. Lachman for Defendant and Respondent.

_____

# INTRODUCTION

Does a church have a duty to protect children from sexual abuse by clergy while the children are attending religious school or participating in other church-sponsored programs?  Because the answer to that question is "yes," we reverse the judgment entered after the trial court, which answered that question "no," granted a motion for summary judgment by the Roman Catholic Archbishop of Los Angeles, a Corporation Sole (the Archdiocese).[1]

---

[1]  "A corporation sole is a perpetual entity through which a religious organization can administer and manage property dedicated to the benefit of that organization." (*Diocese of San Joaquin v. Gunner* (2016) 246 Cal.App.4th 254, 260, fn. 1.) "Corporations Code section 10002 provides that '[a] corporation sole may be formed under this part by the bishop, chief priest, presiding elder, or other presiding officer of any religious denomination, society, or church, for the purpose of administering and managing the affairs, property, and temporalities thereof.'  Such a corporation consists only of the relevant religious officeholder and has no other corporate directors, members, or officers.  In other respects, it has the same powers and duties as other corporations.  The general purpose of a corporation sole is to provide a continuing entity to own property and conduct the business affairs of a local religious institution; each successor to the office of, e.g., bishop, upon fulfilling certain formalities specified in Corporations Code section 10010 succeeds to incumbency of the corporation sole." (*Schofield v. Superior Court* (2010) 190 Cal.App.4th 154, 160, fn. 1.)

# FACTUAL AND PROCEDURAL BACKGROUND

A. *A Priest Allegedly Sexually Abuses Doe at a Church*

In the late 1980's John HG Doe attended catechism classes at Our Lady of the Rosary Catholic Church.[2] Doe's father dropped him off for the classes, which were held in a room near the sanctuary. Father John Higson was an associate pastor at Our Lady of the Rosary, but he was not Doe's teacher.

In August 1988, when he was 10 years old, Doe raised his hand during class to be excused to use the restroom. Doe later said that, while he was in a restroom stall, Higson entered the stall and sexually molested Doe by groping Doe's genitals and forcing Doe to perform oral sex on him. Doe claimed Higson said "every boy does this in order to do their First Communion." Doe returned to class, upset and on the verge of crying, and put his head down on his folded arms. He did not tell his teacher what happened, and the teacher did not ask why Doe was upset or why he had his head down.

Doe claimed a similar incident occurred around the same time. Doe also did not tell his teacher or anyone else at Our Lady

---

[2] A catechism is "a series of fixed questions and answers used for instruction," a "method typically reserved for teaching religious doctrine." (*Moore v. Bryant* (S.D.Miss. 2016) 205 F.Supp.3d 834, 841; see Phillip E. Areeda, *The Socratic Method* (1996) 109 Harv. L.Rev. 911, 911-912 ["Religious instruction of the young has sometimes been in the form of a prepared catechism. Students are presented with a stock of questions and answers: 'Who is God?' Rather than being asked to attempt an answer on their own, the children are provided with one: 'God is the maker of heaven and earth.'"].)

of the Rosary about that incident.  In 2014 Doe told his father that Higson sexually assaulted him.

B.    *The Archdiocese Becomes Aware of and Responds to the Sexual Abuse of Minors by Priests*

The Archdiocese began receiving reports in 1967 of priests sexually abusing minors.  By 1984 the Archdiocese had received 25 reports concerning priests in the Archdiocese alone.  More generally, by the mid-1980's the Archdiocese was aware that clergy sexual abuse of minors was a widespread concern across the country.  In 1985 an "eye-opening and disturbing" panel discussion at the National Conference of Catholic Bishops "was a defining moment for the Church, amounting for all practical purposes to the first widespread recognition that child and adolescent sexual abuse by the clergy was more than a matter of tragic but isolated incidents."

A report, also in 1985, titled *The Problem of Sexual Molestation by Roman Catholic Clergy:  Meeting the Problem in a Comprehensive and Responsible Manner*, "had a great impact," according to the Archdiocese.  That report "informed the Bishops that child sexual abuse by clergy was much more prevalent than the Church previously understood."  The report estimated the Roman Catholic Church's civil liability for clergy sexual abuse of minors would be least $1 billion over the next 10 years, which it called "a conservative cost projection" at "the rate cases [were] developing."  The report proposed the Roman Catholic Church form a "Crisis Control Team" and a "Policy and Planning Group" comprised of "professionals and consultants who possess a significant degree of experience and expertise" to address legal,

4

canonical, and clinical considerations presented by the sexual molestation of children.

Between 1984 and 1988 the Archdiocese received an additional 36 reports of sexual abuse by clergy in the Archdiocese. At least one of those reports involved another priest assigned to Our Lady of the Rosary who, in March 1988, reportedly "'grab[bed] little boys and hug[ged] them.'" And in 1987 a priest in the Archdiocese (but in a different parish) pleaded guilty to sexually molesting minors. In 1987 or 1988 the Archdiocese purchased sexual abuse insurance.

At this time the Archdiocese began developing policies and procedures for preventing clergy sexual abuse. In 1986 then-Archbishop Roger Mahony asked priests attending a retreat to meet with him confidentially if any of them "had engaged in any misconduct with minors." And in 1989 the Archdiocese published its *Policy on Misconduct Involving a Priest*. The policy instructed priests to "avoid the kind of contact with minors that could cause comment on the part of reasonable people," such as "hugging, tickling, [and] wrestling." The policy also prohibited priests from having minors in their rooms or staying overnight at a rectory and advised priests on field trips or vacations with minors to always have at least one other adult present. The policy identified "clear violations" of these guidelines as "danger signs" that fellow priests should "be aware of . . . in our brother priests' activities." The policy also identified "the danger to priests who, without doing anything wrong, seek the company of children and look to them for the emotional support that only normal adult relationships provide."

In 1994 the Archdiocese issued its *Policy on Sexual Abuse by Priests*, which expanded the Archdiocese's efforts to prevent

sexual abuse of minors. The 1994 policy stated the Archdiocese would "educate priests and people about the problem of sexual abuse and set in place screening procedures and educational policies on this subject for those training for the priesthood." The 1994 policy also established procedures for investigating and responding to allegations of sexual abuse by priests, precautions priests should take in their relationships with minors (which mirrored the 1989 guidelines), and screening procedures for priests assigned to the diocese. The policy also created an advisory board to implement the policy and recommended procedures.

In 2002 the Archdiocese created the Safeguard the Children program "to raise the consciousness of the community as a whole to issues of child abuse and neglect, and to sensitize teachers, parents, children, volunteers and all those in ministry to conduct that may be evidence of possible abusive behavior by any adult." The program asked each parish to create a Safeguard the Children committee comprised of parishioners with "relevant expertise," such as nurses, police officers, and parents. The "goals" of each committee were "to inform all parish groups of policies on reporting and preventing child abuse and neglect, to conduct workshops attuned to local needs, to arrange speakers, and, in general, to encourage parish groups to learn about all aspects of child abuse and prevention."

Also in 2002 the Archdiocese distributed to all 288 parishes and parish schools a pamphlet titled *Respecting the Boundaries: Keeping Ministerial Relationships Healthy and Holy*. The pamphlet was designed "to help parishioners understand sexual misconduct in the Church and teach them how to identify possible problems and bring concerns about suspected abuse to

the attention of Church officials." In 2002 the Archdiocese also began comprehensive training programs for clergy regarding mandatory reporting of suspicions of sexual abuse.

In 2004 the Archdiocese issued *Report to the People of God: Clergy Sexual Abuse, Archdiocese of Los Angeles, 1930-2003*, a comprehensive report that represented the Archdiocese's "best understanding of the history of sexual abuse in the Archdiocese and [its] efforts to eliminate this scourge." The report acknowledged that steps the Archdiocese took "in the middle 1980's" to address the problem of sexual abuse of minors by clergy were "insufficient" and that its "learning process was still evolving" into the late 1990's. The report detailed the various policies and procedures the Archdiocese had established regarding reporting, treating offenders, and preventing abuse and catalogued the reports of clergy sexual abuse in the diocese. Regarding prevention measures, the report stated the Archdiocese had updated its 2002 pamphlet for parishioners, *Working Together to Prevent Sexual Abuse: Protecting Children and Young People*, and published in the Archdiocese's newspaper the procedures for reporting sexual abuse.

C.    *Doe Sues the Archdiocese, and the Trial Court Grants the Archdiocese's Motion for Summary Judgment*

Doe filed this action on October 16, 2017. His operative, first amended complaint named the Archdiocese, Our Lady of the Rosary, and Higson as defendants. Neither Our Lady of the Rosary nor Higson is a party to this appeal.[3]

---

[3]    Our Lady of the Rosary filed a motion for summary judgment, arguing it was not a separate legal entity from the

7

Doe alleged the Archdiocese had a duty to protect him when he was entrusted to its care. Doe alleged the Archdiocese breached its duty in a variety of ways, including by negligently supervising and retaining Higson and by failing to properly investigate Higson. Doe also alleged the Archdiocese's duty to protect him included the duty to "educate, train and warn" Doe and other minors involved in youth programs at Our Lady of the Rosary "regarding prevention, detection and reporting of child abuse so as to help safeguard [Doe] and other participants from being sexually abused by priests and other adults associated with those programs." And Doe alleged the Archdiocese "had a duty to educate, train and warn parents and adult agents of [the Archdiocese] and other employees that had regular contact with or oversight of minors in [the Archdiocese's] schools and youth programs regarding prevention, detection and reporting of child abuse so as to help safeguard [Doe] and other minors from being sexually abused . . . ."

Doe further alleged the Archdiocese knew of the "epidemic" of priests sexually abusing minors and had "received a multitude of complaints that its priests had sexually abused minors" beginning in the 1950's. Doe alleged it was foreseeable to the Archdiocese that children entrusted to its care would be vulnerable to sexual abuse if the Archdiocese "did not adequately exercise or provide the duty of care owed to children in [the Archdiocese's] care, including [Doe]." And Doe alleged the Archdiocese failed to provide the required education and training,

Archdiocese. The trial court granted the motion, and Doe does not challenge that aspect of the trial court's order. There is no indication in the record Higson filed a dispositive motion.

despite having implemented various written and unwritten policies in the late 1980's concerning the sexual abuse of children by priests. Doe alleged the Archdiocese's conduct caused Doe, among other injuries, "great pain of mind and body."

The Archdiocese filed a motion for summary judgment or in the alternative for summary adjudication.[4] The Archdiocese argued it did not owe a duty of care to Doe because indisputable evidence showed the Archdiocese did not know and had no reason to know Higson had engaged in any prior misconduct with a minor. The trial court granted the motion, ruling: "[T]he Court finds [Doe] has failed to raise a triable issue of material fact with respect to whether [the Archdiocese] had actual knowledge, or even reason to know, that Higson committed any sexual abuse/misconduct on [or] before the purported abuse of [Doe] in August 1988." The court entered judgment against Doe, and Doe timely appealed.

## DISCUSSION

Doe contends he alleged two theories of negligence, one for negligent hiring, supervision, and retention of priests, and one for negligent failure to educate, train, or warn minors, parents, and Archdiocese employees. He argues that the Archdiocese failed to meet its moving burden on the latter theory and that the court either ignored or applied the wrong legal standard to assess that claim. Because Doe does not contend the trial court erred in connection with his first theory (negligent hiring, supervision,

---

[4] The first amended complaint also alleged a cause of action for child sexual abuse. Doe does not challenge the trial court's ruling granting summary adjudication on that cause of action.

9

and retention), we address only the second theory (negligent failure to educate, train, and warn).

### A.  *Applicable Law and Standard of Review*

A court may grant a motion for summary judgment or summary adjudication "only when 'all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" (*Husman v. Toyota Motor Credit Corp.* (2017) 12 Cal.App.5th 1168, 1179; see Code Civ. Proc, § 437c, subd. (c); *Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 618 (*Regents*).)  "A defendant seeking summary judgment must show that the plaintiff cannot establish at least one element of the cause of action."  (*Regents*, at p. 618; accord, *Mattei v. Corporate Management Solutions, Inc.* (2020) 52 Cal.App.5th 116, 122.)

Where a defendant moves for summary adjudication on a cause of action for which the plaintiff has the burden of proof at trial, the defendant "must present evidence that either 'conclusively negate[s] an element of the plaintiff's cause of action' or 'show[s] that the plaintiff does not possess, and cannot reasonably obtain,' evidence necessary to establish at least one element of the cause of action.  [Citation.]  Only after the defendant carries that initial burden does the burden shift to the plaintiff 'to show that a triable issue of one or more material facts exists as to the cause of action . . . .'"  (*Luebke v. Automobile Club of Southern California* (2020) 59 Cal.App.5th 694, 702-703; see Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853-854.)  "There is a triable issue of material fact if, and only if, the evidence would allow a

reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar*, at p. 850; accord, *Lares v. Los Angeles County Metropolitan Transportation Authority* (2020) 56 Cal.App.5th 318, 331-332.)

"We review a grant of summary judgment de novo and decide independently whether the facts not subject to triable dispute warrant judgment for the moving party as a matter of law." (*Mattei v. Corporate Management Solutions, Inc., supra*, 52 Cal.App.5th at p. 122; see *Regents*, *supra*, 4 Cal.5th at p. 618.) We "'liberally constru[e] the evidence in favor of the party opposing the motion and resolv[e] all doubts about the evidence in favor of the opponent.'" (*Ghazarian v. Magellan Health, Inc.* (2020) 53 Cal.App.5th 171, 182; see *Regents*, at p. 618.)

### B. *The Archdiocese Had a Duty To Protect Doe from Sexual Abuse by Priests or Other Persons Under the Archdiocese's Control*

#### 1. *The Duty To Protect*

"To establish a cause of action for negligence, the plaintiff must show that the 'defendant had a duty to use due care, that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury.' [Citation.] Recovery for negligence depends as a threshold matter on the existence of a legal duty of care." (*Brown v. USA Taekwondo* (2021) 11 Cal.5th 204, 213 (*Brown*); see *Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 292.) "The existence of a duty is a question of law, which we review de novo." (*Vasilenko v. Grace Family Church* (2017) 3 Cal.5th 1077, 1083; see *Regents*, *supra*, 4 Cal.5th at

11

p. 620 ["The determination whether a particular relationship supports a duty of care rests on policy and is a question of law."].)

"A duty exists only if "'the plaintiff's interests are entitled to legal protection against the defendant's conduct."'" (*Brown*, *supra*, 11 Cal.5th at p. 213.) "[T]he law imposes a general duty of care on a defendant only when it is the defendant who has "'created a risk'" of harm to the plaintiff, including when "'the defendant is responsible for making the plaintiff's position worse.'" [Citations.] The law does not impose the same duty on a defendant who did not contribute to the risk that the plaintiff would suffer the harm alleged. Generally, the 'person who has not created a peril is not liable in tort merely for failure to take affirmative action to assist or protect another' from that peril." (*Brown*, at p. 214; see *Regents*, *supra*, 4 Cal.5th at p. 619.) But this "no-duty-to-protect rule" is not absolute. (*Brown*, at p. 215.) "Under some circumstances, a defendant may have an affirmative duty to protect the plaintiff from harm at the hands of a third party, even though the risk of harm is not of the defendant's own making." (*Brown*, at p. 215; see generally *Delgado v. Trax Bar & Grill* (2005) 36 Cal.4th 224, 235.)

In *Brown* the Supreme Court established a two-step inquiry to determine whether a defendant has a legal duty to take action to protect a plaintiff from injuries caused by a third party: "First, the court must determine whether there exists a special relationship between the parties or some other set of circumstances giving rise to an affirmative duty to protect. Second, if so, the court must consult the factors described in [*Rowland v. Christian* (1968) 69 Cal.2d 108 (*Rowland*)] to determine whether relevant policy considerations counsel limiting that duty. (*Brown*, *supra*, 11 Cal.5th at p. 209; see

12

*Regents*, *supra*, 4 Cal.5th at p. 627 [special relationship doctrine is an exception to the general rule that there is no duty to protect others from the conduct of third parties].)

### 2. *The Archdiocese Had a Special Relationship with Doe*

"A special relationship between the defendant and the victim is one that 'gives the victim a right to expect' protection from the defendant, while a special relationship between the defendant and the dangerous third party is one that 'entails an ability to control [the third party's] conduct.'" (*Brown*, *supra*, 11 Cal.5th at p. 216; see *Regents*, *supra*, 4 Cal.5th at p. 619.)  The "common features" of a special relationship include "an aspect of dependency in which one party relies to some degree on the other for protection" and the other party has "superior control over the means of protection." (*Regents*, at pp. 620-621; accord, *Brown v. USA Taekwondo* (2019) 40 Cal.App.5th 1077, 1092, affd. (2021) 11 Cal.5th 204.)  Special relationships also feature "'defined boundaries'" that "'create a duty of care owed to a limited community, not the public at large,'" and many "'benefit the party charged with a duty of care,'" such as in the case of retail stores and hotels.  (*Brown v. USA Taekwondo*, at p. 1092; see *Regents*, at p. 621.)

Examples of special relationships that create an affirmative duty to protect include "[r]elationships between parents and children, colleges and students, employers and employees, common carriers and passengers, and innkeepers and guests." (*Brown*, *supra*, 11 Cal.5th at p. 216; see *Regents*, *supra*, 4 Cal.5th at pp. 619-620; *Doe v. United States Youth Soccer Assn., Inc.* (2017) 8 Cal.App.5th 1118, 1129 (*United States Youth Soccer*).)

13

And "California courts have frequently recognized special relationships between children and their adult caregivers that give rise to a duty to prevent harms caused by the intentional or criminal conduct of third parties." (*United States Youth Soccer*, at p. 1129.) For example, courts have found special relationships between a sport's governing body and minor athletes (*Brown*, at p. 222), a school district (including its employees) and the district's students (*C.A. v. William S. Hart Union High School Dist.* (2012) 53 Cal.4th 861, 869 (*Hart*)), a church camp and its campers (*Doe v. Superior Court* (2015) 237 Cal.App.4th 239, 246), a church and minor members engaged in church-sponsored "field service" (*Conti v. Watchtower Bible & Tract Society of New York, Inc.* (2015) 235 Cal.App.4th 1214, 1217, 1235), a police department and teenage "explorers" participating in a department program (*Doe 1 v. City of Murrieta* (2002) 102 Cal.App.4th 899, 918 (*City of Murrieta*), disapproved on another ground in *Brown*, at p. 222, fn. 9), and a scout organization and its scouts (*Juarez v. Boy Scouts of America, Inc.* (2000) 81 Cal.App.4th 377, 411 (*Juarez*), disapproved on another ground in *Brown*, at p. 222, fn. 9). In cases involving minors, courts generally have recognized a special relationship where adults and organizations "acted as 'quasi-parents' by assuming responsibility for the safety of [minors] whose parents were not present." (*United States Youth Soccer*, at p. 1130; see *Hart*, at pp. 869-870 [the "comprehensive control" that schools exercise over students is "'analogous in many ways to the relationship between parents and their children'"].)

"The existence of such a special relationship puts the defendant in a unique position to protect the plaintiff from injury. The law requires the defendant to use this position accordingly."

(*Brown*, *supra*, 11 Cal.5th at p. 216; see *id.* at pp. 220-221 [special relationship "extends a right of recovery to individuals in relationships involving dependence or control, and who by virtue of those relationships have reason to expect the defendant's protection"]; *Regents*, *supra*, 4 Cal.5th at p. 621 ["'a typical setting for the recognition of a special relationship is where "the plaintiff is particularly vulnerable and dependent upon the defendant who, correspondingly, has some control over the plaintiff's welfare"'"].)  Where there is a special relationship between the defendant and a minor, the obligation to provide protection and assistance may include a duty to protect the minor from third party abuse.  (*Brown*, at p. 220; *Hart*, *supra*, 53 Cal.4th at p. 870.)

The circumstances in this case satisfy the "common features" of a special relationship.  While in catechism classes, Doe and his parents relied on the Archdiocese for Doe's protection, and the Archdiocese had "superior control over the means of protection."  (*Regents*, *supra*, 4 Cal.5th at pp. 620-621; see *id.* at p. 625 [colleges have a special relationship with students because of their "superior control over the environment and the ability to protect students," while "[s]tudents are comparatively vulnerable and dependent on their colleges for a safe environment"]; *Hart*, *supra*, 53 Cal.4th at p. 869 [school district's duty to protect its students arose in part from its comprehensive control over the students]; see also *J.H. v. Los Angeles Unified School Dist.* (2010) 183 Cal.App.4th 123, 142-143 ["'parents may legitimately expect adequate supervision'" in schools].)  Like schools, athletics organizations, junior recreational leagues, and youth programs, the Archdiocese, through its teachers and priests, assumed responsibility for the

15

safety of students in its catechism classes.  (See *United States Youth Soccer*, *supra*, 8 Cal.App.5th at p. 1130; see also *Doe v. Superior Court*, *supra*, 237 Cal.App.4th at p. 247 [church summer camp "stood in loco parentis while minor was at the camp"].)

Of course, as is the case with those entities and organizations, the Archdiocese does not have a special relationship with "the world at large" (*Regents*, *supra*, 4 Cal.5th at p. 626) or even with all of its parishioners (see *Roman Catholic Bishop v. Superior Court* (1996) 42 Cal.App.4th 1556, 1567 [no special relationship between a church and its minor parishioners unless the church had "actual custody or control" of the child, such as where the child attended a church school]).  Thus, the special relationship between the Archdiocese and students participating in its youth programs is appropriately "bounded" by the students' enrollment in those programs.  (*Regents*, at p. 625.)

The Archdiocese argues it did not have a special relationship with Doe because, although he was a parishioner, he was not enrolled in Our Lady of the Rosary's parish school, and the catechism classes he attended "did not take place on the grounds of the Parish school."  The Archdiocese made none of these arguments in its motion for summary judgment; instead, for purposes of the motion, the Archdiocese "assumed" there was a special relationship.[5]  The Archdiocese therefore forfeited these arguments on appeal.  (See *McKenna v. Beesley* (2021) 67 Cal.App.5th 552, 584, fn. 48 [on review of summary judgment, the reviewing court has "no occasion to consider" arguments the

---

[5]     The trial court acknowledged that the existence of a special relationship was relevant to determining the scope of the Archdiocese's liability, but the court did not reach that issue.

defendant did not make in his motion for summary judgment];
*Jackpot Harvesting Co., Inc. v. Superior Court* (2018)
26 Cal.App.5th 125, 155 ["arguments not raised in summary
judgment proceedings" are forfeited].)

Even if not forfeited, the Archdiocese's arguments are
meritless. As discussed, Doe was more than just a parishioner;
he was enrolled in catechism classes at Our Lady of the Rosary.
That Doe was not also enrolled as a student in the Our Lady of
the Rosary's parish school did not preclude the Archdiocese from
having a special relationship with Doe because of his enrollment
in catechism classes, nor did the fact that the alleged assaults did
not occur at the parish school. Doe presented evidence, and the
Archdiocese did not dispute, the alleged assaults occurred on
church property while Doe was in the custody and care of Our
Lady of the Rosary.

Thus, the Archdiocese had good reason for conceding, at
least for purposes of its motion for summary judgment, it had a
special relationship with Doe. And because there was such a
relationship, the Archdiocese had a duty to take reasonable
measures to protect Doe while he attended classes at Our Lady of
the Rosary. (See *Regents*, *supra*, 4 Cal.5th at p. 619 ["a duty to
warn or protect may be found if the defendant has a special
relationship with the potential victim that gives the victim a
right to expect protection"]; *Hart*, *supra*, 53 Cal.4th at p. 877
["the special relationship [school administrators and supervisors]
had with plaintiff, a student under their supervision, . . . entailed
the duty to take reasonable measures to protect plaintiff from
injuries at the hands of others in the school environment"];
*United States Youth Soccer*, *supra*, 8 Cal.App.5th at p. 1129
["special relationships between children and their adult

17

caregivers . . . give rise to a duty to prevent harms caused by the intentional or criminal conduct of third parties"]; *Conti v. Watchtower Bible & Tract Society of New York, Inc.*, *supra*, 235 Cal.App.4th at pp. 1234-1235 [control by a church and its congregation over a church-sponsored activity required them to take reasonable steps to prevent harm to a minor].)

3.      *The* Rowland *Factors Do Not Justify Excusing or Limiting the Archdiocese's Duty To Protect Doe*

a.      *The* Rowland *Factors*

"Even if an organization has a special relationship with the tortfeasor or plaintiff, '[t]he court may depart from the general rule of duty . . . if other policy considerations clearly require an exception.'" (*Brown v. USA Taekwondo*, *supra*, 40 Cal.App.5th at p. 1095; accord, *Regents, supra*, 4 Cal.5th at p. 628.)  The factors set forth in *Rowland* "may, on balance, justify excusing or limiting a defendant's duty of care."  (*Regents*, at p. 628; see *Brown v. USA Taekwondo*, at p. 1095.)

The *Rowland* factors are "'the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.'" (*Regents, supra*, 4 Cal.5th at p. 628, quoting *Rowland, supra*, 69 Cal.2d at p. 113; see *Brown*,

18

*supra*, 11 Cal.5th at p. 217.)  "The *Rowland* factors fall into two categories.  The first group involves foreseeability and the related concepts of certainty and the connection between plaintiff and defendant.  The second embraces the public policy concerns of moral blame, preventing future harm, burden, and insurance availability."  (*Regents,* at p. 629; see *Brown v. USA Taekwondo*, *supra*, 40 Cal.App.5th at p. 1096.)  "'The most important factor to consider in determining whether to create an exception to the general duty to exercise ordinary care . . . is whether the injury in question was *foreseeable*.'"  (*Regents*, at p. 629, quoting *Kesner v. Superior Court* (2016) 1 Cal.5th 1132, 1145 (*Kesner*).)

"In considering [the *Rowland* factors], we determine 'not whether they support an exception to the general duty of reasonable care on the facts of the particular case before us, but whether carving out an entire category of cases from that general duty rule is justified by clear considerations of policy.'"  (*Regents*, *supra*, 4 Cal.5th at p. 629; see *Brown*, *supra*, 11 Cal.5th at p. 221.)  Thus, while a court considers "whether the parties have a special relationship by considering the particular facts and circumstances of their association with one another," a court considers the *Rowland* factors "'at a relatively broad level of factual generality.'"  (*Brown*, at p. 221.)

> b.    *The* Rowland *Factors Do Not Support an Exception from the Duty To Protect Doe*

The trial court granted summary adjudication on Doe's cause of action for negligence because the court ruled Doe failed to create a triable issue of fact on the first *Rowland* factor, foreseeability.  The trial court, however, applied the wrong

19

standard for foreseeability and did not consider the other *Rowland* factors.

The Archdiocese did not argue in the trial court, and does not argue on appeal, that any of the *Rowland* factors other than foreseeability supports an exception to the duty of care. Neither party addresses whether the Archdiocese, as the party moving for summary judgment, had the burden to show the *Rowland* factors weighed in favor of an exception or whether Doe, as the plaintiff, had the burden to show they did not.[6] As with all defendants moving for summary judgment, the burden should be on the Archdiocese to show the *Rowland* factors support an exception to the duty of care. (See, e.g., *Morris v. De La Torre* (2005) 36 Cal.4th 260, 277 [defendant failed to justify an exception to the duty of care on summary judgment because the facts relevant to the *Rowland* factor concerning the burden to the defendant were disputed].) And the Archdiocese did not meet this burden because it did not address all of the *Rowland* factors. Nevertheless, because the Supreme Court has not definitively ruled on this issue (see, e.g., *Vasilenko v. Grace Family Church*,

---

[6] The plaintiff generally has the burden to plead and prove at trial that the defendant had a duty of care, including, where applicable, that the *Rowland* factors do not justify a categorical exception. (See *Brown*, *supra*, 11 Cal.5th at pp. 212-213 [approving the "two-part framework" in which "a plaintiff must satisfy both the special relationship test and the *Rowland* factors before a duty to protect the plaintiff from third party harm can be imposed on the defendant"]; see also *Smith v. Freund* (2011) 192 Cal.App.4th 466, 474 [a plaintiff who alleges a defendant had a duty to control another person based on a special relationship has the burden to show the *Rowland* factors do not create an exception to that duty].)

20

*supra*, 3 Cal.5th at pp. 1087-1089 [holding on summary judgment that the *Rowland* factors supported an exception to the duty of care, after repeatedly rejecting the plaintiff's policy arguments and without referring to counterarguments from the defendant]; *Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138, 1150 [finding no duty on summary judgment where the plaintiff did not produce sufficient evidence of foreseeability]; *Parsons v. Crown Disposal Co.* (1997) 15 Cal.4th 456, 474 [concluding on summary judgment that the burden to the defendant weighed in favor of an exception to the duty of care in part because the plaintiff offered no counterargument]),[7] we will address the *Rowland* factors and conclude they do not support an exception to the duty of care.

### i.     *Foreseeability Factors*

*Foreseeability.*  As discussed, the trial court ruled the Archdiocese was entitled to summary judgment because Doe did not create a triable issue of fact regarding whether the Archdiocese had actual or constructive knowledge Higson had sexually abused minors before he abused Doe.  The court erred in using this standard.

"In examining foreseeability, 'the court's task . . . "is not to decide whether a *particular* plaintiff's injury was reasonably

---

[7]     In still other cases, including *Regents*, the Supreme Court discussed the *Rowland* factors without addressing the burden of proof on summary judgment.  (See, e.g., *Regents*, *supra*, 4 Cal.5th at pp. 628-634; *O'Neil v. Crane Co.* (2012) 53 Cal.4th 335, 365; *Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 774-784; *Delgado v. Trax Bar & Grill*, *supra*, 36 Cal.4th at pp. 245-247.)

foreseeable in light of a *particular* defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed."'" (*Regents*, *supra*, 4 Cal.5th at p. 629, quoting *Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 772; accord, *Brown v. USA Taekwondo*, *supra*, 40 Cal.App.5th at p. 1096.)  For example, in *Regents* the plaintiff sued the University of California for negligence after a student with known mental health issues stabbed the plaintiff in a chemistry lab.  (*Regents*, at p. 613.)  The Supreme Court held colleges have a duty to take reasonable steps to protect students from violence in the classroom because "violence against students in the classroom or during curricular activities, while rare, is a foreseeable occurrence." (*Id.* at p. 629.)  The Supreme Court observed that a well-known instance of campus violence at a college in Virginia had prompted colleges across the country "to reexamine their campus security policies" and that attacks by and against college students were "happening more frequently." (*Ibid.*)  The Supreme Court also observed that colleges across the country, including universities in California, had "created threat assessment protocols and multidisciplinary teams to identify and prevent campus violence." (*Id.* at pp. 629-630.)

Doe presented considerable evidence the Archdiocese was well aware in the late 1980's that numerous priests had been accused of sexually abusing minors in the Archdiocese and around the country.  Between 1967 and 1988, the Archdiocese received 49 reports of sexual abuse by clergy in its parishes and parish schools.  One of those reports involved another priest assigned to Our Lady of the Rosary, and in 1987 a priest in the

Archdiocese pleaded guilty to sexually abusing minors. The Archdiocese's various reports and publications also acknowledged widespread clergy sexual abuse before August 1988, when Higson allegedly molested Doe.

Based on this evidence, it was reasonably foreseeable that minors attending catechism classes in 1988 might be sexually molested by a priest, even though the Archdiocese did not have knowledge of prior sexual misconduct by Higson specifically. (See *Brown v. USA Taekwondo*, *supra*, 40 Cal.App.5th at pp. 1097-1098 [governing body for the sport of taekwondo could reasonably foresee that youth athletes attending competitions with their coaches might be sexually molested by them, even though the governing body had no knowledge of prior sexual misconduct by a specific coach, where the plaintiff alleged the governing body "'regularly received complaints from athletes or their parents regarding improper sexual conduct by coaches'" and was "'aware that female taekwondo athletes . . . were frequently victims of sexual molestation by their coaches'"]; *United States Youth Soccer, supra*, 8 Cal.App.5th at pp. 1132, 1135 [youth soccer associations could reasonably foresee minors might be sexually abused by their coaches where the associations "were aware that sexual predators were drawn to their organization in order to exploit children and that there had been prior incidents of sexual abuse of children in their programs"]; *Juarez*, *supra*, 81 Cal.App.4th at p. 404 ["it should be reasonably foreseeable to the Scouts that a child participating in scouting might fall prey to a sexual predator, with no documented history of such proclivities, who is serving as an adult volunteer in the child's scouting troop"].)

23

The Archdiocese cites *Doe v. Los Angeles County Dept. of Children & Family Services* (2019) 37 Cal.App.5th 675 for the proposition that, "'[i]n addition to the special relationship . . ., there must also be evidence showing facts from which the trier of fact could reasonably infer that the [defendant] had prior *actual knowledge*, and thus *must have known*, of the offender's assaultive propensities.'" (*Id.* at p. 682.) *Doe v. Los Angeles County Dept. of Children & Family Services* in turn cited *Romero v. Superior Court* (2001) 89 Cal.App.4th 1068, 1084 for that proposition. *Romero*, however, was decided before the Supreme Court's more recent decisions making clear that, when determining whether the defendant has a duty, such case-specific questions are not the right ones to ask. As the Supreme Court explained in *Regents*, "case-specific foreseeability questions are relevant in determining the applicable standard of care or breach in a particular case. They do not, however, inform our threshold determination that a duty exists." (*Regents*, *supra*, 4 Cal.5th at p. 630; see *id.* at p. 629 ["the duty analysis [under *Rowland*] is categorical, not case specific"]; see also *Brown*, *supra*, 11 Cal.5th at p. 221 [the *Rowland* factors consider whether to justify a categorical exception to the duty to protect]; *Kesner*, *supra*, 1 Cal.5th at pp. 1143-1144 ["[b]ecause a judicial decision on the issue of duty entails line drawing based on policy considerations," we ask not whether the *Rowland* factors "'support an exception to the general duty of reasonable care on the facts of the particular case before us, but whether carving out an entire category of cases from that general duty rule is justified by clear considerations of policy'"]; *Cabral v. Ralphs Grocery Co.*, *supra*, 51 Cal.4th at p. 772 [same].) The Supreme Court decisions issued since *Romero* are controlling on the issue of foreseeability.

The Archdiocese also argues Doe must show "heightened foreseeability" requiring "actual knowledge" of prior third party criminal conduct to justify imposing a duty to protect him from the criminal acts of a third party, like those of Higson. California courts apply the concept of heightened foreseeability to address "the narrow question" of when a proprietor's "special-relationship-based duty" to protect its patrons or invitees includes a duty to provide security guards or take similar burdensome measures. (*Delgado v. Trax Bar & Grill*, *supra*, 36 Cal.4th at p. 236; see *Castaneda v. Olsher* (2007) 41 Cal.4th 1205, 1222; *Hanouchian v. Steele* (2020) 51 Cal.App.5th 99, 109.) The heightened foreseeability standard does not apply in the circumstances here.[8]

---

[8] The heightened foreseeability standard is somewhat related to the *Rowland* factor that considers the burden that recognizing a tort duty would impose on the defendant and the community. In *Delgado v. Trax Bar & Grill, supra*, 36 Cal.4th 224 the Supreme Court stated that, "as a general matter, imposition of a high burden requires heightened foreseeability, but a minimal burden may be imposed upon a showing of a lesser degree of foreseeability." (*Id*. at p. 243; see *United States Youth Soccer*, *supra*, 8 Cal.App.5th at p. 1131.) The Supreme Court, however, did not incorporate the heightened foreseeability standard into its consideration of the *Rowland* factors in *Brown*, *Regents*, or *Hart*, all of which considered the scope of the duty to protect persons from a third party's criminal conduct. As discussed, case-specific foreseeability considerations may affect the reasonableness of measures a plaintiff alleges a defendant must take to satisfy its duty of care. (See *Regents*, *supra*, 4 Cal.5th at pp. 630, 633.)

*Certainty*.  "The second factor, 'the degree of *certainty* that the plaintiff suffered injury' [citation], may come into play when the plaintiff's claim involves intangible harm, such as emotional distress." (*Regents*, *supra*, 4 Cal.5th at p. 630.)  Doe alleged he suffered harm to his "mind and body, shock, emotional distress, physical manifestations of emotional distress," and other emotional harm.  Courts have recognized that "'[t]he significant emotional trauma caused by childhood sexual abuse . . . is well documented.'" (*Brown v. USA Taekwondo, supra*, 40 Cal.App.5th at p. 1098; see *City of Murrieta, supra*, 102 Cal.App.4th at p. 916; *Juarez, supra*, 81 Cal.App.4th at p. 405.)  The Archdiocese's 1994 *Policy on Sexual Abuse by Priests* and 2004 report also acknowledged that victims of sexual abuse may experience "devastating consequences," including spiritual and psychological harm.

*Connection with defendant's conduct*.  "The third factor is 'the *closeness of the connection* between the defendant's conduct and the injury suffered.'  [Citation.]  'Generally speaking, where the injury suffered is connected only distantly and indirectly to the defendant's negligent act, the risk of that type of injury from the category of negligent conduct at issue is likely to be deemed unforeseeable.  Conversely, a closely connected type of injury is likely to be deemed foreseeable.'" (*Regents, supra*, 4 Cal.5th at pp. 630-631; see *Cabral v. Ralphs Grocery Co., supra*, 51 Cal.4th at p. 779.)  Doe claimed the Archdiocese failed to prevent Higson from sexually abusing him by failing to educate, train, or warn potential victims, their parents, and their teachers.  Although Higson's conduct was the immediate cause of Doe's injury, "the existence of an intervening act does not necessarily attenuate a

26

defendant's negligence. Rather, 'the touchstone of the analysis is the foreseeability of that intervening conduct.'" (*Regents*, at p. 631; see *Kesner*, *supra*, 1 Cal.5th at p. 1148.)

The connection here was similar to the connection in *Brown v. USA Taekwondo*, where the governing body for taekwondo knew some coaches had sexually abused their athletes, but did not have reason to suspect the coach who molested the plaintiffs. (See *Brown v. USA Taekwondo, supra*, 40 Cal.App.5th at p. 1099 [governing body's "failure to . . . prevent taekwondo coaches from sexually abusing female athletes is closely connected to the injury plaintiffs suffered because action by [the governing body] could have reduced the risk of plaintiffs being abused by limiting inappropriate contact between coaches and youth athletes"].) Similarly, the failure to implement policies to prevent the sexual abuse of minors—including policies to train, educate, and warn students, parents, and teachers—increased the likelihood priests would abuse children attending afterschool classes. (See *United States Youth Soccer, supra*, 8 Cal.App.5th at pp. 1136-1137 [soccer league's failure to conduct a criminal background check of prospective coaches made it more likely the league would hire the coach who molested the plaintiff]; *City of Murrieta, supra*, 102 Cal.App.4th at pp. 914, 916 [police department's failure to restrict contact between the plaintiffs and officers by, for example, prohibiting "one-on-one ride-alongs late at night," contributed to the likelihood that officers and the plaintiffs would become sexually involved]; *Juarez, supra*, 81 Cal.App.4th at p. 406 [Boy Scouts' failure to educate scouts, their parents, and adult volunteers to protect scouts from sexual abuse created "a sufficient causal link between the acts or omissions of the Scouts and the harm [the plaintiff] suffered"].)

ii.     *Policy Factors*

Even if the foreseeability factors under *Rowland* do not support an exception to the duty of care, we must also consider whether public policy considerations do.  (*Regents, supra*, 4 Cal.5th at p. 631; see *Vasilenko v. Grace Family Church, supra*, 3 Cal.5th at p. 1086 [the existence of a duty also depends on policy considerations for and against imposing liability].)  "'A duty of care will not be held to exist even as to foreseeable injuries . . . where the social utility of the activity concerned is so great, and avoidance of the injuries so burdensome to society, as to outweigh the compensatory and cost-internalization values of negligence liability.'" (*Regents*, at p. 631; accord, *Vasilenko*, at pp. 1086-1087.)

*Moral blame.*  The Supreme Court has assigned moral blame, and relied in part on that blame in finding a duty to protect, in "instances where the plaintiffs are particularly powerless or unsophisticated compared to the defendants or where the defendants exercised greater control over the risks at issue.'" (*Regents, supra*, 4 Cal.5th at p. 631; see *Kesner, supra*, 1 Cal.5th at p. 1151.)  For example, the Supreme Court in *Regents* acknowledged that "adult students can no longer be considered particularly powerless or unsophisticated," but still assigned some moral blame to the university for an adult student's injury because, "compared to students, colleges will typically have access to more information about potential threats and a superior ability to control the environment and prevent harm." (*Regents*, at pp. 631-632.)  Minors enrolled in religious school classes or other extracurricular activities are less powerful

28

and less sophisticated than young adult college students, and the Roman Catholic Church undoubtedly had access to information unavailable to students and parents that could have enabled them to take measures to prevent the abuse.

But courts have hesitated to assign moral blame in cases where the defendant did not know or have reason to know that a particular teacher or coach would sexually abuse the plaintiff. (See, e.g., *Hart*, *supra*, 53 Cal.4th at p. 878 ["Unless the individual alleged to be negligent in a hiring or retention decision knew or should have known of the dangerous propensities of the employee who injured the plaintiff, there is little or no moral blame attached to the person's action or inaction."]; *United States Youth Soccer*, *supra*, 8 Cal.App.5th at p. 1137 [no moral blame attributed to a soccer league for failing to conduct criminal background checks on prospective coaches where there was no evidence the league knew a particular coach would sexually abuse the plaintiff]; *City of Murrieta*, *supra*, 102 Cal.App.4th at pp. 914, 916 [court assigned some moral blameworthiness to a police department that failed to "interven[e] when there was an apparent risk of sexual exploitation" despite knowing an officer was violating department rules for interactions with minors].) And in *Regents* the university knew or had reason to know the student attacker had previously committed violent acts. (*Regents*, *supra*, 4 Cal.5th at pp. 613-616.) In light of the significant disparity in knowledge, sophistication, and control between the Archdiocese and minor students, however, we attribute some moral blame to the Archdiocese because it took only minimal action to prevent sexual abuse by priests, even after receiving dozens of reports of abuse in the Archdiocese before Higson abused Doe. (See *Brown v. USA Taekwondo*, *supra*,

29

40 Cal.App.5th at p. 1100 [attributing "'[s]ome measure of moral blame' to [the governing body for taekwondo] because it failed to take action to prevent sexual abuse by coaches," even after it became aware coaches were sexually abusing minor athletes], italics omitted.)

*The policy of preventing future harm.* "'The overall policy of preventing future harm is ordinarily served, in tort law, by imposing the costs of negligent conduct upon those responsible. The policy question is whether that consideration is outweighed, for a category of negligent conduct, by laws or mores indicating approval of the conduct or by the undesirable consequences of allowing potential liability.'" (*Regents, supra*, 4 Cal.5th at p. 632; see *Cabral v. Ralphs Grocery Co.*, *supra*, 51 Cal.4th at pp. 781-782.) Here, as in other cases involving the protection of children from sexual predators, the societal goal of safeguarding youth from sexual abuse weighs strongly in favor of imposing a duty to implement policies and procedures to protect minors attending church-sponsored classes or other programs without their parents or guardians. (*Brown v. USA Taekwondo*, *supra*, 40 Cal.App.5th at p. 1100; see *Randi W. v. Muroc Joint Unified School Dist.* (1997) 14 Cal.4th 1066, 1078-1079 ["One of society's highest priorities is to protect children from sexual or physical abuse."]; *United States Youth Soccer, supra*, 8 Cal.App.5th at p. 1137 ["our society recognizes that the protection of children from sexual abuse is a paramount goal"]; *City of Murrieta, supra*, 102 Cal.App.4th at p. 916 [for a law enforcement agency, "preventing future harm to minors is certainly appropriate"]; *Juarez, supra*, 81 Cal.App.4th at p. 407 ["The interests of the state in protecting the health, emotional welfare and well-

rounded growth of its young citizens, together with its undeniable interest in safeguarding the future of society as a whole, weigh strongly in favor of imposing a duty . . . ."].)  In this case, as in those, "recognizing a duty serves the policy of preventing future harm."  (*Regents*, at p. 632.)

*Burden.*  We also consider the burden that recognizing a tort duty would impose on the defendant and the community.  (*Regents*, *supra*, 4 Cal.5th at p. 633.)  Doe argues the burden is minimal because the Archdiocese "has already adopted policies designed to protect against child molestation by its priests."  In general, however, "our duty analysis looks to the time when the duty was assertedly owed."  (*Kesner*, *supra*, 1 Cal.5th at p. 1150.)  Almost all of the policies Doe cites, like the Safeguard the Children program, were not adopted until after (and some not until long after) Doe was molested.  In *City of Murrieta* and *Juarez* the courts found imposing a duty to prevent sexual abuse of minors minimally burdensome, at least in part because the defendants in those cases already had developed policies to prevent such abuse.  (See *City of Murrieta*, *supra*, 102 Cal.App.4th at pp. 914-915; *Juarez, supra*, 81 Cal.App.4th at pp. 407-408; see also *Regents*, at p. 633 ["Because the record reflects that colleges have already focused considerable attention on identifying and responding to potential threats, and have funding sources available for these efforts, it does not appear that recognizing a legal duty to protect students from foreseeable threats would pose an unmanageable burden."].)  In those cases, the defendants' alleged negligence arose from their failure to effectively communicate and implement existing policies.

In *Brown v. USA Taekwondo*, *supra*, 40 Cal.App.5th 1077, however, we concluded that "incentivizing" the governing body for taekwondo "to adopt policies that adequately protect youth athletes and to ensure the policies are followed would not impose a substantial burden," in part because, by the time the plaintiffs filed their complaint, the governing body had enacted policies that prohibited sexual relations between coaches and athletes. (*Id.* at pp. 1083, 1085, 1101.) At the time of the assaults in that case, the governing body was generally aware of the risk of sexual abuse by coaches and had acquired insurance to cover that risk. (*Id.* at pp. 1084-1085.) Similarly, although the Archdiocese had not adopted and implemented programs like Safeguard the Children when Higson allegedly molested Doe, the Roman Catholic Church was well aware of the problem of clergy sexual abuse, had purchased liability insurance, had begun to formulate policies to prevent child sexual abuse, and had the means to disseminate those policies to its parishes. (See *Regents*, *supra*, 4 Cal.5th at p. 633 ["recognizing a legal duty to protect students from foreseeable threats would [not] pose an unmanageable burden" where the defendant had already contributed significant resources and attention to campus violence prevention]; *Juarez*, *supra*, 81 Cal.App.4th at p. 408 [organization that had "people and systems . . . already in place to see that vital information needed to combat child sexual abuse is communicated at every level" of the organization would not be burdened by implementing policies and procedures to reduce child sexual abuse].)

Moreover, the court in *Juarez* found significant the role the Boy Scouts played in the lives of families participating in its program: "[M]illions of American parents partner with the Scouts collectively for the development of their children's core

32

values. . . .  [¶] [¶]  With the privilege of being able to contribute directly to the moral and spiritual development of millions of American youths comes some legal responsibility." (*Juarez*, *supra*, 81 Cal.App.4th at pp. 408-409.)  The same is true here. Given that families throughout the Archdiocese turn to the Roman Catholic Church for religious and moral teaching and guidance, imposing some burden on the Archdiocese to establish and implement reasonable policies for the prevention of clergy sexual abuse, including by training, educating, and warning students, parents, and teachers (which Safeguard the Children and other programs now do) is not too onerous a burden to impose.

*Insurance*.  The final *Rowland* factor is the availability of insurance for the risk involved.  (*Regents, supra*, 4 Cal.5th at p. 633; *Brown v. USA Taekwondo, supra*, 40 Cal.App.5th at p. 1101.)  The record shows the Archdiocese obtained insurance to cover sexual abuse by priests in 1987 or 1988, but Doe points to no evidence regarding the availability and cost of insurance today.  Although the Archdiocese did not present evidence it is no longer able to obtain such insurance, this factor does not weigh for or against imposing the duty to protect.  (See *United States Youth Soccer, supra*, 8 Cal.App.5th at pp. 1137-1138.)

\* \* \*

Neither the foreseeability factors nor the policy factors under *Rowland* support an exception to imposing a duty on the Archdiocese to act with reasonable care to prevent the sexual abuse of minors in its custody by priests or other adults over

33

whom the Archdiocese exercises some control.  Whether the measures the Archdiocese took in the 1980's satisfied or breached its duty to act with reasonable care with respect to Doe is not an issue in this appeal.  (See *Regents, supra*, 4 Cal.5th at p. 634 ["We emphasize that a duty of care is not the equivalent of liability."].)  The reasonableness of the Archdiocese's response to the potential threat of clergy sexual abuse to minors in the care of the Archdiocese is a question of breach.  (*Id.* at p. 633; see *Vasilenko v. Grace Family Church, supra*, 3 Cal.5th at p. 1084 ["[b]reach, injury, and causation must be demonstrated on the basis of facts adduced at trial, and a jury's determination of each must take into account the particular context in which any act or injury occurred"].)

## DISPOSITION

The judgment is reversed.  The trial court is directed to vacate its order granting the Archdiocese's motion for summary judgment and to enter a new order denying the motion.  Doe is to recover his costs on appeal.

SEGAL, J.

We concur:

PERLUSS, P. J.          FEUER, J.

34